Ginger ROGERS, Plaintiff,

v.

**Alberto GRIMALDI and MGM/UA Entertainment Co., Defendants.**

Ginger ROGERS, Plaintiff,

v.

**PEA PRODUZIONI EUROPEE ASSOCIATE, S.R.L., Defendant.**

Nos. 86 Civ. 1851 (RWS), 86 Civ. 7481 (RWS).

United States District Court, S.D. New York.

Aug. 5, 1988.

Bower & Gardner, New York City, for plaintiff; Barry G. Saretsky, Alan G. Katz, of counsel.

Pryor, Cashman, Sherman & Flynn, New York City, for defendants; Stephen F. Huff, Tom J. Ferber, Charles B. McKenna, of counsel.

## OPINION

SWEET, District Judge.

Defendants Alberto Grimaldi ("Grimaldi"), MGM/UA Entertainment Co. ("MGM") and PEA Produzioni Europee Associate, s.r.l. ("PEA") (collectively, "De-

fendants") have moved pursuant to Fed.R. Civ.P. 56 for summary judgment dismissing the complaints of plaintiff Ginger Rogers ("Rogers") in their entirety. Upon the findings and conclusions set forth below, the motion is granted.

What must be determined here is the boundary between commercial and artistic speech and the extent of the protection given under the First Amendment to the expression of an idea in a commercial film "Federico Fellini's 'Ginger and Fred'" (the "Film"), as opposed to the protection of a famous actress' name, Ginger Rogers, under the Lanham Act and the common law. The conflict is direct and significant and was presented with skill and strength by able advocates. In this contest artistic expression has prevailed, indeed, at least in part as a consequence of the symbolic fame of Ginger Rogers.

*Facts*

Ginger Rogers is well-known, a celebrity who enjoys a world-wide reputation. She has been performing in one entertainment medium or another for over 50 years, most prominently in motion pictures, having played major roles in some 73 films over a 35 year period and having won an Academy Award for her performance of the title role in "Kitty Foyle" in 1940. Rogers' greatest impact as far as this fact-finder is concerned, however, is attributable to the ten musical films in which she co-starred with Fred Astaire. These films, beginning with "Flying Down to Rio" in 1933 and concluding with "The Barkleys of Broadway" in 1949, established Fred Astaire and Ginger Rogers as the icons of elegant ballroom dancing during Hollywood's Golden Age. This famous pair became so well known that the term "Fred and Ginger" has come to be a metaphorical symbol for fine ballroom dancers and is frequently used in the press as a shorthand term for elegant dancers and dancing.[1]

1. The following are excerpts from some of the newspaper and magazine articles submitted by Defendants in which dancers are referred to as "Fred and Ginger" and dance numbers as "Fred and Ginger" routines:

(a) "Sashaying into Ballroom Dancing," by Dorothy MacKinnon. *The Washington Post,* August 27, 1982. Reference: "For the real aficionados, dancing becomes a way of life. Washington's serious Freds and Gingers do most of their dancing at the social dances held by area studios."

(b) "Music and Dance Star in Film Maker's Short," by Jennifer Dunning. *The New York*

During her career, Rogers has maintained a high standard of taste, avoiding that which she considers seedy, ugly, or profane. During her lifetime, while she has lent her name to certain enterprises, such as J.C. Penney, Rogers has been highly selective with respect to such endorsements.

The subject of this action is "Federico Fellini's 'Ginger and Fred,'" a motion picture that began a relatively brief U.S. theatrical distribution in March 1986. MGM distributed the Film in the U.S. All the advertising and posters for the Film entitled it as it is in the defined term. PEA produced the Film, and Grimaldi acted as its individual producer. Federico Fellini ("Fellini"), who conceived, co-wrote and directed the Film, is widely regarded as one of the world's greatest film-makers. Over the last 34 years he has brought 17 full length films to the motion picture screen, four of which—"La Strada," "The Nights of Cabiria," "8½" and "Amarcord"—have garnered the Academy Award for Best Foreign Film.

The Film, which was advertised in promotional posters as "[t]he movie that looks at television through the eyes of Fellini," is a fictional work that depicts the bittersweet reunion of two retired dancers. Decades earlier, as the Film's story goes, these two dancers had made a living in Italian cabarets imitating Fred Astaire and Ginger Rogers, thus earning the nickname "Ginger and Fred." The Film satirizes the world of television by presenting the central characters' reunion against the background of an Italian television special for which they are called upon to reprise the routine that they have not performed in 30 years. Marcello Mastroianni and Giulietta Masina play the roles of Pippo and Amelia, the aging Italian "hoofers" who try to defy time by reviving their imitation of two legendary dancers of a bygone era.[2]

In an affidavit submitted in support of Defendants' motion, Fellini, who is not a party but who took part in writing both the story treatment and the actual screenplay for the Film, explained his reasons for utilizing Astaire and Rogers as the subject of the Film's imitation:

> [M]y reason for using this nickname for my characters is that Fred Astaire and Ginger Rogers were a glamorous and care-free symbol of what American cinema represented during the harsh times

Times, August 30, 1983. Reference: "... the film's dance styles range from disco and 1920's jazz to a final 'Fred and Ginger' filmed on the esplanade ..."
(c) "And Now For The Samurai Flamenco, By A Japanese Isadora," by Barbara Rowes. *People*, June 14, 1982. Reference: "She began working with Miguel in 1967, and they became the Fred and Ginger of flamenco."
(d) "Foxtrotting Without Fear," by Faye Rice. *Fortune*, March 17, 1986. Reference: "Other aspiring Freds and Gingers remain more footloose."
(e) "Affairs of the Hearts," by Jamie Gold. *The Washington Post*, December 2, 1981. Reference: "This Valentine's Day it's easy to become entangled in an affair. For instance, Georgetown Park is having a free one Sunday, with a big-band jazz 1 to 3 and a professional ballroom dance couple offering instruction in dancing a la Fred and Ginger."

2. Although the Film received mixed reviews in the United States, the following excerpts evince the reviewers' recognition of the Film's characters as imitators of Rogers and Astaire and of the tribute that the Film intended to make:
(a) "Last Waltz in Roma," by Jack Kroll. *Newsweek*, March 31, 1986:

... Fellini's film is an act of homage to [Astaire and Rogers]. By casting Giuletta Masina and Marcello Mastroianni as two retired old hoofers who used to bill themselves as Ginger and Fred, Fellini acknowledges the mythic status of the great American dance team.
(b) "Film: Lost Souls and Soulful Strangers," by Julie Salamon. *The Wall Street Journal*, April 3, 1986:

The press materials for Federico Fellini's new movie, 'Ginger and Fred,' firmly state that the movie has nothing to do with Fred Astaire and Ginger Rogers. This is more or less true.... All references to the real Fred and Ginger are entirely respectful and almost beside the point, since the purpose of the picture seems to be to satirize television, and more obliquely, life itself.
(c) "Roman Holiday" by Stanley Kauffman. *The New Republic*, April 14, 1986:

[The Film's couple] was professionally known as Ginger and Fred. Played by [Masina and Mastroianni], they haven't the slightest resemblance to their namesakes; but they did wear similar clothes, tried to dance like the famous pair, used the same tunes, and cashed in, as they imitatively could—in music halls, not in films—on the Italian passion for Hollywood.

which Italy experienced in the 1930's and 1940's. It comforted us to know that a different kind of life existed. In those grey and difficult times, the films of Ginger Rogers, Clark Gable, Fred Astaire and Greta Garbo consoled us with thoughts of a better world. That is why in my film I have created central characters who, the story goes, had become popular in Italy by performing their "Ginger and Fred" routine.

With respect to the Film's central characters, Fellini stated:

> The characters of Amelia and Pippo in [the Film] do not in any way resemble Fred Astaire and Ginger Rogers, nor were they ever intended to portray them. Rather, Amelia and Pippo are two aging and retired dancers who were Italian cabaret performers, whose "act" consisted of an imitation of the American legends whose name they borrowed for their routines.

As opposed to portraying Rogers and Astaire in any representative form, Fellini claims that he invoked Rogers and Astaire "only as a reference in the film based on their well-deserved reputation as paragons of style and excellence in dancing."

Rogers commenced this action in March 1986, at or about the time the Film began its theatrical distribution in the U.S. She seeks permanent injunctive relief and money damages "arising from defendants' impermissible and unlawful misappropriation and infringement of Ginger Rogers' public personality." (Compl. ¶ 1). Rogers' first claim for relief is premised on the common law right of publicity. Her second claim alleges that the Film constitutes a false light invasion of privacy because it allegedly "depicts the Film's dance team, Fred and Ginger, as having been lovers and depicts them in a seedy manner." (Compl. ¶ 18). Her third claim is based upon Section 43(a) of the Lanham Act and alleges that the Film creates the false impression that Rogers endorsed or was involved in it. (Compl. ¶ 23).

After two years of discovery, Defendants moved for summary judgment dismissing the complaint. In opposition to the motion, Rogers has submitted a market research survey dated July 1986 which reports that based on approximately 200 interviews in Boston and New York (Staten Island) 43% of those exposed to the Film's title only connected the Film with Rogers and that 27% of those exposed to the Film's advertisement connected the Film with Rogers. Rogers also learned during discovery that MGM had devised several promotional ideas for marketing the Film on the strength of the public's familiarity with Ginger Rogers and Fred Astaire. These ideas included using still photographs of Ginger Rogers and Fred Astaire, requesting that guests invited to the New York premiere of the Film "Dress: Ginger or Fred," and using a "Ginger and Fred" dance cane, an item associated with Fred Astaire, despite the fact that the male lead in the Film does not use a cane during dance routines. Only the latter suggestion was ultimately implemented.

Oral argument on Defendants' motion for summary judgment was held on April 22, 1988.

*Summary Judgment*

Fed.R.Civ.P. 56 provides that "a court shall grant a motion for summary judgment if it determines that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). If the evidence is such that a reasonable finder of fact could return a verdict for the non-moving party, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). After adequate time for discovery, if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, summary judgment is appropriate. In such a situation, there can be no "genuine issue as to any material fact," since a failure of proof on an essential element of the case of the non-moving party "necessarily renders all other facts

immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986).

Here, Defendants contend that Rogers' claims are precluded by the protections afforded Defendants pursuant to the First Amendment. The Defendants argue that the references to Rogers are entirely permissible and are part and parcel of Fellini's film, which is protected artistic expression. Rogers contends that the protections afforded by the First Amendment are not absolute and do not shield the Defendants' unauthorized appropriation, use and commercial exploitation of her name. Invoking the limited First Amendment protection that is afforded to "commercial speech," Rogers argues that her proprietary rights and the right of the public to be free from deception outweigh the Defendants' free speech claim because there were alternate ways for Defendants to communicate the message they claim the Film conveys.

*Motion Pictures Are Protected By The First Amendment's Guarantees of Freedom of Speech and of the Press*

The proposition "that motion pictures are a form of expression protected by the First Amendment," *Natco Theatres, Inc. v. Ratner*, 463 F.Supp. 1124, 1128 (S.D.N.Y.1979), has been settled for more than three decades, since the Supreme Court's decision in *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). In *Burstyn*, the Court addressed the constitutionality of a New York statute that gave the New York State Board of Regents licensing authority over the exhibition of motion pictures, and which permitted the banning of films on the grounds that they were "sacrilegious." *Burstyn*, 343 U.S. at 497, 72 S.Ct. at 778. Following a determination that a film by Roberto Rossellini entitled "The Miracle" was sacrilegious, the Board of Regents had rescinded the license for its exhibition. The New York Court of Appeals rejected constitutional challenges to the licensing statute, but the Supreme Court reversed on appeal. The Court stated:

It cannot be doubted that motion pictures are a significant medium for the commu-

nication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform.

*Id.*, at 501, 72 S.Ct. at 780 (footnote omitted). Thus, the Court concluded that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Id.* at 502, 72 S.Ct. at 781. The Court reaffirmed this principle with respect to all works of entertainment in *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981):

Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee.

*Schad*, 452 U.S. at 65, 101 S.Ct. at 2181 (citations omitted).

The New York courts, mindful of the importance of the First Amendment's protections and of the potential danger of levying civil sanctions which might inhibit artistic expression, have carefully guarded against imposing liability in connection with motion pictures. Thus, in the leading New York case of *University of Notre Dame Du Lac v. Twentieth Century–Fox Corp.*, 22 A.D.2d 452, 256 N.Y.S.2d 301 (1st Dep't), *aff'd*, 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965), the Court stated:

It is at once apparent, when we deal with the content of a book or motion picture, that we deal with no ordinary subject of commerce. Motion pictures, as well as books, are "a significant medium for the communication of ideas"; their importance "as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform"; and like books, they are a consti-

tutionally protected form of expression notwithstanding that "their production, distribution, and exhibition is a large-scale business conducted for private profit" (*Joseph Burstyn v. Wilson*, 343 U.S. 495 [72 S.Ct. 777] . . .; *Jacobellis v. State of Ohio*, 378 U.S. 187 [84 S.Ct. 1676, 12 L.Ed.2d 793 (1964)] . . .).

*Notre Dame*, 256 N.Y.S.2d at 306. Accordingly, the courts in New York are cautious not to construe the First Amendment's scope too narrowly and have recognized its applicability to all legitimate forms of entertainment. As the court stated in *Paulsen v. Personality Posters, Inc.*, 59 Misc.2d 444, 299 N.Y.S.2d 501 (N.Y.Co.1968):

> The scope of the subject matter which may be considered of "public interest" or "newsworthy" has been defined in most liberal and far reaching terms. The privilege of enlightening the public is by no means limited to dissemination of news in the sense of current events but extends far beyond to include all types of factual, educational and historical data, or even entertainment and amusement, concerning interesting phases of human activity in general.

*Paulsen*, 299 N.Y.S.2d at 506. The courts of this Circuit have been equally vigilant in recognizing the protection afforded artistic expression. *See, e.g., United States v. A Motion Picture Film Entitled "I Am Curious—Yellow"*, 404 F.2d 196, 199 (2d Cir. 1968); *Natco Theatres v. Ratner*, 463 F.Supp. at 1128; *Man v. Warner Bros. Inc.* 317 F.Supp. 50, 52 (S.D.N.Y.1970); *but cf. Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366 (S.D. N.Y.), *aff'd*, 604 F.2d 200 (2d Cir.1979).

Rogers maintains that there are countervailing legal and policy reasons why Defendants' unauthorized use of her name should not receive First Amendment protection. First, she contends that such use violates Section 43(a) of the Lanham Act. Second, Rogers contends that such use violates her rights to publicity and constitutes an invasion of privacy. Rogers contends that the First Amendment does not bar either claim because Defendants had alternate ways to convey the Film's message.

*The Lanham Act Claim*

Section 43(a) of the Lanham Act imposes civil liability on "[a]ny person who shall . . . use in connection with any goods or services . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent same, and shall cause such goods to enter into commerce . . ." 15 U.S.C. § 1125(a). In support of her claim that Defendants' unauthorized use of her name in the screen play and title of the film constitutes a false designation of origin, Rogers relies on *Allen v. National Video, Inc.*, 610 F.Supp. 612 (S.D.N.Y. 1985) and *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 467 F.Supp. 366 (S.D.N.Y.), *aff'd*, 604 F.2d 200 (2d Cir. 1979).

*Allen* involved an advertisement for a video rental chain that used a picture of a Woody Allen double. Discussing the applicability of the Lanham Act to acts that confuse the public with respect to a celebrity's endorsement of, or involvement with, goods or services, the court stated:

> A celebrity has a . . . commercial investment in the "drawing power" of his or her name and face in endorsing products and in marketing a career. The celebrity's investment depends upon the good will of the public, and infringement of the celebrity's rights also implicates the public's interests in being free from deception when it relies on a public figure's endorsement in an advertisement. The underlying purposes of the Lanham Act therefore [are] implicated in cases of misrepresentations regarding the endorsement of goods and services.

*Allen*, 610 F.Supp. at 625–26. In *Allen*, however, there was no dispute that the advertisement at issue was purely commercial speech, *Allen* 610 F.Supp. at 618, 622, and, therefore, was entitled to less protection than other constitutionally safeguarded forms of speech. See *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). Because the defendant's sole purpose in using a

Woody Allen look alike in its advertising was to capitalize on Allen's familiar name, face and "reputation for artistic integrity" in order to boost sales of its movie rentals, the court found that such use violated the Lanham Act's prohibition against misleading advertising.

*Dallas Cowboys*, which involved the pornographic film "Debbie Does Dallas," in which the central character participates in sexual escapades wearing some but not always all the distinctive trademarked costume of the Dallas Cowboy Cheerleaders, presents a closer question concerning the unauthorized use of a celebrity's notoriety. On plaintiff's motion for a preliminary injunction, the court was asked to decide whether the film "Debbie Does Dallas," its promotion, and its advertising violated Section 43(a). In addition to finding that the movie depicted the film's lead, Debbie, engaging in sexually explicit conduct wearing a uniform resembling the Dallas Cowboy Cheerleaders uniform, the court found that the defendants had advertised the film with a large marquee containing a picture of Debbie wearing the uniform and that print advertisements for the film falsely represented that the woman playing the role of Debbie was an ex-Dallas Cowboy Cheerleader. Stating that "[i]t would appear obvious that Section 43(a) of the Lanham Act applies to a motion picture," *Dallas Cowboys*, 467 F.Supp. at 375, the court next considered whether the First Amendment afforded any protection to the defendants.

The film's promoter argued that the film was a parody or satire on female cheerleaders. Addressing this argument, the court stated:

> It has been long settled in our jurisprudence that the rights of free expression, embodied in the First Amendment and other legal doctrines are subject to rights under the copyright and trademark laws. In the copyright area, one means of accommodation between the conflicting interests is the "fair use" doctrine, which permits certain use of copyrighted material to be made for purposes such as news reporting, criticism, scholarship— and parody and satire.

*Id.* (citing Second Circuit copyright "fair use" cases). After discussing the meaning of the terms parody and satire, the court strongly rejected the defendant's claim that "Debbie Does Dallas" fell within that definition:

> In the present case, there is no content, by way of story line or otherwise, which could conceivably place the movie Debbie Does Dallas within any definition of parody and satire. The purpose of the movie has nothing to do with humor; it has nothing to do with a commentary, either by ridicule or otherwise, upon the Dallas Cowboys Cheerleaders. There is basically nothing to the movie Debbie Does Dallas, except a series of depictions of sex acts.

*Dallas Cowboys*, 467 F.Supp. at 376. The court concluded that the plaintiff's service marks and trademarks had been misappropriated for commercial purposes:

> The use of the associations with the Dallas Cheerleaders both in the film and in the advertising, all have the *single purpose* of exploiting the Dallas Cheerleaders' popularity in order to attract customers to view the sex acts in the movie.

*Id.* (emphasis added).

Affirming the district court's issuance of a preliminary injunction against the film's distribution and exhibition, the Second Circuit did not reach the question whether the "fair use" doctrine is applicable to trademark infringements, although it agreed with the district court that the film's use of the Dallas Cheerleaders' uniform "hardly qualifies as parody or any other form of fair use." *Dallas Cowboys*, 604 F.2d at 206.[3] Instead, the Court of Appeals appears to have rejected the defendants' claim of First Amendment protection on other grounds:

> ..., it would be somewhat anomalous to hold that the confusing use of another's trademark is 'fair use.'" *Dallas Cowboys*, 604 F.2d at 206 & n. 9.

---

**3.** The Second Circuit stated that it was "unlikely that the fair use doctrine is applicable to trademark infringements," noting in a footnote that since "the primary purpose of the trademark laws is to protect the public from confusion,

That defendants' movie may convey a barely discernible message does not entitle them to appropriate plaintiff's trademark in the process of conveying that message.... Plaintiff's trademark is in the nature of a property right, ..., and as such it need not "yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 567 [92 S.Ct. 2219, 2228, 33 L.Ed.2d 131] ... (1972). Because there are numerous ways in which defendants may comment on "sexuality in athletics" without infringing plaintiff's trademark, the district court did not encroach upon their first amendment rights in granting a preliminary injunction.

*Id.* The Circuit's decision in *Dallas Cowboys* thus permitted the Lanham Act to override First Amendment concerns, noting that the defendant had alternate ways of communicating his message without infringing upon the protected mark.

Construed narrowly, in light of the district court's express finding that the sole purpose of defendants' appropriation of the mark was "simply to use the attracting power and fame of the Dallas Cowboy Cheerleaders to draw customers for the sexual 'performances' in the film," *Dallas Cowboys*, 467 F.Supp. at 376, the Second Circuit's opinion is consistent with Supreme Court decisions holding that the "Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 563,

100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. at 456, 457, 98 S.Ct. at 1918, 1919). Among the reasons why commercial speech receives limited First Amendment protection is the legitimate public interest in suppressing "commercial messages that do not accurately inform the public about lawful activity." *Id.*[4]

In addition, the Supreme Court has held that where a company "enjoy[s] the full panoply of First Amendment protections for [its] direct comments on public issues, [t]here is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions." *Id.* 447 U.S. at 563 n. 5, 100 S.Ct. at 2349 n. 5. Therefore, "advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger v. Youngs Drug Prod.*, 463 U.S. at 68, 103 S.Ct. at 2881 (quoting *Central Hudson Gas & Elec.*, 447 U.S. 557, 563 n. 5, 100 S.Ct. 2343, 2349 n. 5, 65 L.Ed.2d 341 (1980)). Although the language of the opinions of both the district court and the Court of Appeals in *Dallas Cowboys* do not contain any express limitation of the Lanham Act's override of the First Amendment to cases involving speech that is primarily commercial, such a narrowing is implicit in subsequent decisions of the Second Circuit in which the Court has held that "[m]isleading commercial speech" regulated by the Lanham Act "is beyond the protective reach of the First Amendment." *Vidal Sassoon, Inc. v. Bristol–Myers Co.*,

---

4. In *Central Hudson Gas & Elec. Corp.*, the Supreme Court also suggested that a restriction on non-misleading commercial speech may be justified if the government's interest in the restriction is substantial and if the restriction directly advances the government's asserted interest and is no more extensive than necessary to serve the interest. *Central Hudson Gas & Elec.*, 447 U.S. at 566, 100 S.Ct. at 2351. In *San Francisco Arts & Athletics, Inc. [SFAA] v. United States Olympic Committee [USOC]*, —— U.S. ——, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), the Court recently relied on the government's assertion of a strong interest in promoting, through the USOC's activities, the participation of amateur athletes from the United States in the Olympic Games to uphold against a First Amendment challenge a statute that granted the USOC the exclusive use of the word "Olympic." There, the Court found that the USOC's use of trademark remedies to prohibit the SFAA's use of the word to promote the "Gay Olympic Games" was not barred by the First Amendment even though the SFAA claimed to have used the word for both commercial and political purposes. *SFAA v. USOC*, 107 S.Ct. at 2983. The Court based its holding, in part, on a finding that the SFAA's use of the word could not be divorced from the commercial value the USOC's efforts had given to it and was "a clear attempt to exploit the imagery and goodwill created by the USOC." *Id.* & n. 19.

661 F.2d 272, 276 n. 8 (2d Cir.1981); *see also Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1052 (2d Cir.1983).

How to identify the line between commercial and artistic speech, however, constitutes the difficulty presented in the instant case. In an era where artistic expression is often intertwined with the use of well-known symbols, which because of their familiarity may have commercial value, to read *Dallas Cowboys* as Rogers suggests to require courts to decide whether an artistic message could have been conveyed in some other manner would have a chilling effect on the free expression of creative ideas.

■ As the late Andy Warhol is reported to have stated, "Being good in business is the most fascinating kind of art." With annual sales in the international auction market exceeding one billion dollars, *see* Kernan, "The Great Debate Over Artists' Rights," *The Washington Post*, May 22, 1988, at F1, it is hardly surprising that for some artists, like Warhol, the distinction between art and commerce has blurred beyond recognition. The staggering box office receipts of smash hit movies and the burgeoning video rental market may have a similar effect on the hearts and minds of those in the film industry. *More* than three decades ago, however, the Supreme Court rejected the contention that simply because the "production, distribution, and exhibition [of motion pictures] is a large-scale business conducted for private profit," expression by means of films should not be protected by the First Amendment. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. at 501–02, 72 S.Ct. at 780. Therefore, before expression through film can be curtailed by the Lanham Act, the party seeking relief bears the heavy burden of establishing that the challenged speech is intended primarily to serve a commercial function.

■ In the instant case, Defendants contend that the use of Rogers' first name in the title and screenplay of the Film constitutes an exercise of artistic expression rather than commercial speech. On the basis of viewing the Film and the undisputed facts in the record, it is so found.

In the commercial speech cases discussed above, the defendants' use of the plaintiffs' celebrated image or symbol was intended primarily to persuade the public to consume something that either had no connection to the plaintiff, *Allen*, or to convey the false impression that plaintiff was somehow involved with or had endorsed the product, *Dallas Cowboys*. Here, by contrast, the relevance of "Ginger" in both the Film's title and screenplay is apparent at two levels. First, the title accurately refers to the fictionalized nicknames of the Film's two central characters. Second, the screenplay establishes the reference to Rogers and Astaire as the basis for the Film's characters' livelihood and thereby recognizes the Rogers and Astaire phenomenon as a known element of modern culture.

In addition, the record here establishes that the Film's satirical vision of television entertainment in the 1980's rests in part on the contrast provided by the old hoofers' imitation of Hollywood entertainment in a bygone era. The director's affidavit evinces Fellini's intent to evoke an American cultural symbol the existence of which Rogers concedes in her complaint. There is nothing in the record to suggest that Fellini intended to use Rogers' name to deceive the public into flocking to his movie under the mistaken belief that the Film was about the true Rogers and Astaire. Moreover, the critics' reviews uniformly acknowledge the Film's artistic tribute to Rogers and Astaire. Against the overwhelming evidence squarely placing the Film's title and screenplay within the realm of artistic expression, the fact that the Film's distributors may have conceived of and even executed a few schemes to exploit commercially the public's familiarity with Rogers' name does not turn either the film or its title into commercial speech. *See Bolger v. Young Drug Prod.*, 463 U.S. at 67, 103 S.Ct. at 2880.

Having determined that the speech in question is artistic expression, whether there were alternate avenues open to Fellini to convey his film's message is not subject to examination by this court. Because

the speech at issue here is not primarily intended to serve a commercial purpose, the prohibitions of the Lanham Act do not apply, and the Film is entitled to the full scope of protection under the First Amendment.

*The State Law Claims*

[3] Rogers' right of publicity claim rests on allegations of Defendants' unauthorized use of her name and public personality for advertising purposes or purposes of trade. *See, e.g., Estate of Presley v. Russen,* 513 F.Supp. 1339, 1353 (D.N.J. 1981); *Ali v. Playgirl, Inc.,* 447 F.Supp. 723, 728–29 (S.D.N.Y.1978). Defendants contend that this claim and Rogers' false light invasion of privacy claim are precluded by overriding constitutional concerns raised by the First Amendment's protection of artistic speech.[5]

Courts have been consistently unwilling to recognize the right of publicity cause of action where the plaintiff's name or picture was used in connection with a matter of public interest, be it news or entertainment. In *Paulsen v. Personality Posters, Inc.,* 59 Misc.2d 444, 299 N.Y.S.2d 501 (N.Y.Co.1968), the court denied comedian Pat Paulsen's motion for a preliminary injunction preventing the defendant from marketing posters bearing his photograph and the words "For President," in connection with Paulsen's mock run for the White House in 1968. The court noted that matters of public interest—from newspapers to motion pictures—are not to be considered as distributed for purposes of trade, "notwithstanding that they are also carried on for a profit." *Paulsen,* 299 N.Y.S.2d at 506. The court observed that Paulsen, like Rogers in the present case, "is concededly a well-known public personality by professional choice" and "indeed, as an entertainer he actively seeks to promote and stimulate such public attention to enhance his professional standing." *Id.* at 507. The court rejected Paulsen's claim, concluding:

> [E]ven where the "right of publicity" is recognized, it does not invest a prominent person with the right to exploit financially every public use of his name or picture. What is made actionable is the unauthorized use for advertising purposes in connection with the sale of a commodity.... The "right of publicity," therefore, like that of "privacy" is at best a limited one, within the context of an advertising use, and would be held to have no application where the use of name or picture, as is here the case, as [sic] in connection with a matter of public interest.

*Id.* at 508–09 (citations omitted).

The court in *Frosch v. Grosset & Dunlap, Inc.,* 75 A.D.2d 768, 427 N.Y.S.2d 828 (1st Dep't 1980), used a similar analysis in affirming summary judgment against the plaintiff, the executor of Marilyn Monroe's estate, who had brought suit on a book entitled "Marilyn." While noting that the New York courts did not recognize a descendible right of publicity, the court held:

> Special Term held that the book here involved is what it purports to be, a biography, and as such did not give rise to a cause of action in favor of the estate for violation of a right to publicity. Plaintiff disputes the characterization of the book as a biography. We think it does not matter whether the book is properly described as a biography, a fictional biography, or any other kind of literary work. It is not for a court to pass on literary categories, or literary judgment. It is enough that the book is a literary work and not simply a disguised commercial advertisement for the sale of goods or services.

*Frosch,* 427 N.Y.S.2d at 829. In *Ann Margret v. High Society Magazine, Inc.,* 498 F.Supp. 401 (S.D.N.Y.1980), in which the plaintiff-actress brought right of privacy and publicity claims against a "soft-porn" magazine that had published several photographs of her from a film in which she had appeared partially nude, the Honorable Gerard L. Goettel also weighed the protections of the First Amendment against a public figure's right to publicity. Discussing the limitations that the First Amend-

---

**5.** Since, as discussed below, broad constitutional concerns, not narrow distinctions based on different states' laws, require dismissal of Rogers' claims, her attempt to raise a choice of law issue by arguing that the law of Oregon, her state of residence, rather than that of New York or California, governs her state law claims need not be addressed.

ment imposes on New York's statutory right to publicity, the court stated:

> This provision, which, if read literally, would provide an extremely broad cause of action applicable to virtually all uses of a person's name or picture, including the use of the new media, has been narrowly construed by the courts, especially in the context of persons denominated "public figures," so as "to avoid any conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest" guaranteed by the First Amendment.... Thus, as has been noted by the New York courts, "freedom of speech and the press under the First Amendment transcends the right to privacy." *Namath v. Sports Illustrated*, 80 Misc.2d 531, 535, 363 N.Y.S.2d 276, 280 (N.Y.Co.1975), *aff'd*, 48 A.D.2d 487, 371 N.Y.S.2d 10 (1st Dep't 1975), *aff'd mem.* 39 N.Y.2d 897, 352 N.E.2d 584, 386 N.Y.S.2d 397 (1976).

*Ann Margret*, 498 F.Supp. at 404 (other citations omitted). The court also noted "there is little doubt that the plaintiff, who has starred in numerous movies and television programs ... is, as the term has come to be understood, a 'public figure.'" *Id* Accordingly, the court granted summary judgment dismissing the complaint, stating:

> Plaintiff's claim fares no better when considered as one for violation of the common law "right to publicity." As has been noted, ... [the right to publicity] "does not invest a prominent person with the right to exploit financially every public use of name or picture." ... It is only when such use is made "for advertising purposes, or for the purposes of trade," ... that a cause of action arises. And it is well settled that simple use in a magazine that is published and sold for profit does not constitute a use for advertising or trade sufficient to make out an actionable claim, even if its "manner of use and placement was designed to sell the article so that it might be paid for and read." *Oma v. Hillman Periodicals, Inc.*, 281 A.D. 240, 244, 118 N.Y.S. 2d 720, 724 (1st Dep't 1953).

*Ann Margret*, 498 F.Supp. at 406 (other citations omitted).

In *Hicks v. Casablanca Records*, 464 F.Supp. 426 (S.D.N.Y.1978), the Honorable Lawrence W. Pierce addressed another factual situation similar to that presented here. Plaintiffs, the heir and assignees of the late mystery writer Agatha Christie, sued regarding the distribution of a movie and book entitled "Agatha," a fictional work about what might have transpired during an actual eleven day disappearance by Ms. Christie during her life. The court noted that Ms. Christie had been "one of the best-known mystery writers in modern times" and that she had cultivated her name "in such a way as to make it almost synonymous with mystery novels." *Hicks*, 464 F.Supp. at 428. The plaintiffs sought to enjoin distribution of the film and book, alleging unfair competition and infringement of the right of publicity, and the defendants moved to dismiss the complaint on First Amendment grounds. In considering the First Amendment's applicability, the court stated:

> ... more so than posters, bubble gum cards, or some other "merchandise," books and movies are vehicles through which ideas and opinions are disseminated and, as such, have enjoyed certain constitutional protections, not generally accorded "merchandise."

*Id.* at 430. After concluding that "there are no countervailing legal or policy grounds against" extending First Amendment protection to the book and film, the court dismissed the right of publicity claim. *Id.* at 431. Like the film and book "Agatha," "Federico Fellini's 'Ginger and Fred'" is not a piece of "merchandise" like a perfume or line of apparel, whose name would likely bear no relation to the product. To the contrary, the Film is a protected work of artistic expression, the product of one of the world's great cinematic artists, clearly labeled as such in every poster and advertisement.

In addition to the cases discussed above, perhaps the most compelling opinion counselling that Rogers' claims are precluded as a matter of law by the First Amendment is that of the alternate majority of the California Supreme Court in *Guglielmi v. Spelling–Goldberg Productions*, 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454 (1979)

(Bird, C.J., concurring).[6] *Guglielmi* concerned an unauthorized and fictionalized television film entitled "Legend of Valentino: A Romantic Fiction" on the life of actor Rudolph Valentino. Like Rogers here, the plaintiff (as putative assignee of Valentino's rights) complained that the defendants "used Valentino's name, likeness and personality in a fictionalized film which did not accurately portray his life." *Guglielmi*, 160 Cal.Rptr. at 354, 603 P.2d at 456. Observing that "this is not a case in which a celebrity's name is used to promote or endorse a collateral commercial product or is otherwise associated with a product or service in an advertisement," *Guglielmi*, 160 Cal.Rptr. at 355 n. 6, 603 P.2d at 457 n. 6, the opinion discussed the important role played by fictional works as a form of social commentary:

> It is clear that works of fiction are constitutionally protected in the same manner as political treatises and topical news stories. Using fiction as a vehicle, commentaries on our values, habits, customs, laws prejudices, justice, heritage and future are frequently expressed. What may be difficult to communicate or understand when factually reported may be poignant and powerful if offered in satire, science fiction or parable.

*Id.* at 357, 603 P.2d at 459. The majority rejected the plaintiff's claim that the use of Valentino's name and likeness in the film was impermissible and unnecessary and that it was done solely to increase the film's value, stating:

> If this analysis were used to determine whether an expression is entitled to constitutional protection, grave harm would result. Courts would be required not merely to determine whether there is some minimal relationship between the expression and the celebrity ... but to compel the author to justify the use of the celebrity's identity.... Such a course would inevitably chill the exercise of free speech—limiting not only the

manner and form of expression but the interchange of ideas as well.

> Contemporary events, symbols and people are regularly use in fictional works. Fiction writers may be able to more persuasively, more accurately express themselves by weaving into the tale persons or events familiar to their readers. The choice is theirs. No author should be forced into creating mythological worlds or characters wholly divorced from reality. The right of publicity derived from public prominence does not confer a shield to ward off caricature, parody and satire. Rather, prominence invites creative comment.

*Id.* at 358, 603 P.2d at 460. As the court concluded with respect to Valentino, since Rogers and Astaire are similarly "part of the cultural history of an era," their fame is an equally "apt topic" for Fellini's fictional work. *See id.*

Finally, Chief Justice Bird's opinion explained why the use of Valentino's name in advertising the film was equally protected and permissible:

> A similar result is compelled for the use of Valentino's name and likeness in advertisements for the film. That use was merely an adjunct to the exhibition of the film. It was not alleged that the advertisements promoted anything but the film. Having established that any interest in financial gain in producing the film did not affect the constitutional stature of respondents' undertaking, it is of no moment that the advertising may have increased the profitability of the film. It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise. Since the use of Valentino's name and likeness in the film was not actionable infringement of Valentino's right of publicity, the use of his identity in advertisements for the film is similarly not actionable.

---

**6.** The holding in *Guglielmi* is set forth in a brief *per curiam* opinion stating that in accordance with *Lugosi v. Universal Pictures*, 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979), decided the same day, since California did not recognize a descendible right of publicity, the complaint

was properly dismissed. Chief Justice Bird addressed the First Amendment concerns raised by the plaintiffs' claims in the concurring opinion, discussed below, which she authored for an alternate majority of the court.

*Id.* at 360, 603 P.2d 462. This rationale applies with equal force to Rogers' claims concerning promotion of the Film in the United States. Since Fellini's right to use Rogers and Astaire as a cultural reference point in this film is protected, the related advertising cannot be actionable.

The cases on which Rogers primarily relies to support her right of publicity claim can be distinguished from the instant case. In *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), the plaintiff performed a "human cannonball" act which the defendant broadcast on a news program. In a narrowly drawn opinion effectively limited to its facts, the Supreme Court held that the First Amendment did not bar the plaintiff's claim because Zacchini's "entire act" had been appropriated by the broadcast on television without his permission, thereby seriously interfering with the public's desire to pay to see him and destroying the economic viability of plaintiff's act. *Zacchini,* 433 U.S. at 575, 97 S.Ct. 2849. By contrast, here the Film does not interfere with Rogers' economic viability, there having been no showing that her reputation has suffered in any way from the Film. Indeed, one might assume that the reverse may be true, given the critical acclaim achieved by the Film and the resulting enhancement of Astaire and Rogers' fame. In *Estate of Presley v. Russen,* 513 F.Supp. 1339 (D.N.J.1981), which involved a concert featuring an Elvis Presley imitator, the court concluded that the imitator's concert was not protected since it "serves primarily to commercially exploit the likeness of Elvis Presley without contributing anything of substantial value to society" and that it "does not really have its own creative component and does not have a significant value as pure entertainment." *Estate of Presley,* 513 F.Supp. at 1359. Here, Rogers does not contend that the Film does not have its own creative component and, as discussed above, the Film's use of Rogers' name is not primarily for a commercial purpose.

*Conclusion*

Under the authorities discussed above, Rogers' claims, which are all premised on the same subject matter, fail as a matter of law because the Film is a work of protected artistic expression. It is not an "ordinary subject of commerce," a simple "commodity" or a piece of "merchandise." Under the cited authorities, the Film does not meet the requirements for "trade or advertising" or an "advertisement in disguise" for a "collateral commercial product." Thus, the Film enjoys the full protection of the First Amendment. Fellini was entitled to create a satire of modern television built around the bittersweet reunion of two somewhat tattered, retired hoofers who once earned the nicknames "Ginger and Fred" by imitating America's dancing legends, one of whom is the plaintiff here. Equally protected is the title of the Film, an integral part of the work's artistic expression, which is a reference to its central characters.

Upon the findings and conclusions set forth above, the motion for summary judgment dismissing the complaint with costs is granted. Enter judgment on notice.

It is so ordered.