SAGAMORE CORP., Plaintiff-Appellee,

v.

DIAMOND WEST ENERGY CORPORATION and Howard F. Bovers, Defendants-Appellants.

No. 151, Docket 86–7440.

United States Court of Appeals, Second Circuit.

Argued Oct. 31, 1986.

Decided Dec. 1, 1986.

Jeffrey Glekel, New York City (Steven Kronengold, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for defendants-appellants.

Richard B. Cooper, New York City (Austrian, Lance & Stewart, New York City, of counsel), for plaintiff-appellee.

Before MANSFIELD, MESKILL and MINER, Circuit Judges.

MANSFIELD, Circuit Judge:

In this lawsuit based on diversity jurisdiction Diamond West Energy Corporation ("Diamond West") and Howard F. Bovers ("Bovers") appeal from a judgment of the Southern District of New York, Miriam Goldman Cedarbaum, J., ordering them to transfer 1,985,000 shares of the stock of Diamond East Energy Corporation ("Diamond East") to plaintiff Sagamore Corp. ("Sagamore") pursuant to the terms of a written agreement between the parties. Defendants contend that the agreement is unenforceable under New York law, that enforcment was waived, and that they were excused on grounds of impracticability from performing their promise to obtain long-term financing within a specified time period. We affirm.

During the summer and fall of 1984, Richard C. Schmitz, president of Sagamore, negotiated with Bovers, chairman of Diamond West and a sophisticated investor, for the joint creation and development of plants for the generation of power to be supplied to utilities. After signing a letter of intent dated October 9, 1984, the parties, on December 12, 1984, entered into a written agreement entitled "Equity Participation Agreement" ("EPA") for promotion of the venture with respect to the first unit, called "the Project," which was expected to be constructed in New England, either off-shore or on land, and operated for the supply of power to the Boston Edison Company in Massachusetts.

Under the terms of the EPA, Sagamore was to act as manager of the Project until professional management could be obtained. The EPA provided that a separate entity, to be called Diamond East Energy Corporation, would be formed to "carry out the Project" and that at the outset the equity in the Project would be owned by Sagamore with the expectation that, upon the joint approval of Sagamore and Diamond West, some equity interests would be issued to certain persons (called the "Minority Equity Holders") for their efforts in promoting and helping to manage the Project. Par. 4 further provided that Diamond West would "have an opportunity to acquire an equity participation in the Project equal to that of Sagamore after issuance of interests to the Minority Equity Holders" provided it (1) negotiated to Sagamore's satisfaction the acquisition of fuel supplies for the Project, (2) provided a non-refundable equity capital investment in the Project of not less than $1.5 million, and (3) obtained all additional financing needed for the Project. In addition, Par. 5 obligated Diamond West (a) to obtain by July 1, 1985, a written commitment from a public utility to buy the Project's power output, to be used as the basis for obtaining financing other than the $1.5 million equity capital, and (b) to obtain, within six months after securing the commitment from a public utility, a commitment from a responsible financial institution to provide the remainder of the necessary financing, estimated at $90 million. Diamond West agreed that if it should fail to meet either of these two requirements it would "retransfer and return, without cost or expense to Sagamore, all of its equity percentage in, and business records of, the Project free of all claims." The EPA provided that it "shall be governed and construed by the laws of the State of Connecticut."

On January 29, 1985, Diamond East was formed as a corporation under the laws of Delaware to develop and manage the prospective power generation project. On February 22, 1985, the initial meeting of the company's six directors (Bovers, Schmitz, Brandt, Pecoraro, Brown and Steinorth) took place. Bovers was elected Chairman and Schmitz Vice Chairman. Persons who were professionals in the energy business were retained as its managers, including Helmut H. Brandt, the company's first president and in June 1985 William M. Irving, who became vice president and general manager of its construction activities and engineering. Simultaneously with the employment by Diamond East of Irving, who had been employed for 33 years by Boston Edison Co. and later by the Jacksonville Electric Authority, Bovers on May 30, 1985, acting on behalf of Diamond East, signed an agreement with Boston Edison under which it agreed to purchase $40 million per year of power from Diamond East for a period of 25 years. Bovers also negotiated an option with the Boston Sand & Gravel Co. for the acquisition of a land site for the power plant, a letter of intent from Bechtel Construction, Inc., to construct the power plant, and a letter of intent from Salomon Brothers to act as financial advisor to Diamond East in its quest for the estimated $90 million in long-term financing needed to carry out the project. Salomon Brothers, however, did not commit itself to fund the $90 million financing required for the Project.

At a meeting on May 13, 1985, of Bovers, Schmitz, David Brown (Sagamore's attorney), Leo Arnaboldi (Diamond West's attorney) and Charles Frank of Salomon Brothers, it was agreed that Diamond East stock should be issued by it and on June 11, 1985, its board of directors voted to issue 1,985,000 shares each to Sagamore and Diamond West, which would give each 50% of the shares outstanding except for small amounts to be issued to certain directors.[1] Thereafter these shares were issued, including 1,985,000 shares to Diamond West. The district court found that the issuance

---

1. The minority interest shares issued to certain directors of Diamond East were: Henry Steinorth, 7,500 shares; Joseph Pecoraro, 7,500 shares; Jack Fitzpatrick, 7,500 shares; William Irving, 3,800 shares.

of shares to Diamond West was not intended as a modification of Par. 5 of the EPA.

During the summer and fall of 1985, the relations between Schmitz and Bovers deteriorated, with disputes arising between them over Bovers' failure to make the investment of up to $1.5 million in the capital of Diamond East and allegations that Bovers and others were attempting to acquire the project site for themselves, to siphon off some of Diamond East's limited funds, to privately pursue Diamond East's project for themselves, and to seize control of Diamond East. In the meantime Diamond West did not carry out its commitment to make the investment in Diamond East and did not succeed in obtaining the $90 million long-term financing within 6 months after May 30, 1985, as required by Par. 5(b) of the EPA. One difficulty faced by Diamond West in seeking the $90 million financing within the agreed-upon six-month period was the inability to obtain environmental permits for the project within that timespan and the fact that no responsible lender would provide the funds until permitting was completed. However, Diamond West never asked Sagamore for an extension of time to secure the permits. Nor is there any evidence that a financial institution would not have been willing to commit itself, subject to permitting, to lending the $90 million.

By September 30, 1985, Diamond East, because of lack of capital, was unable to meet its bills as they became due. Yet Diamond West did not honor its commitment to invest $1.5 million in the venture. As a result, in December 1985 the Braintree office of Diamond East was closed.

On December 1, 1985, Sagamore demanded the return and transfer by Diamond West to Sagamore of the 1,985,000 shares of Diamond East that had been issued to Diamond West. When Diamond West failed to comply, Sagamore, on December 27, 1985, commenced the present action against Diamond West and Bovers. The complaint sought, among other things, (1) $20 million damages based on Diamond West's conversion of the 1,985,000 shares

of Diamond East, which prevented Diamond West from accepting offers by others to purchase the outstanding shares of Diamond East for that amount, (2) specific performance of the EPA, (3) an order enjoining the defendants from disclosing to any third-party confidential information that had been furnished by Sagamore or obtained by the defendants in the course of their involvement in the project, and (4) punitive damages. The defendants, denying the material allegations of the complaint, asserted various affirmative defenses and counterclaimed for a declaratory judgment (1) that the EPA was void, (2) that Diamond West was entitled to the 1,985,000 shares of Diamond East issued to it, and (3) that Diamond West should be excused by reason of the plaintiff's wrongful conduct from performance of certain obligations under the EPA. In addition, Diamond West counterclaimed for the return by the plaintiff and Schmitz of books and records of Diamond East and for $20 million damages based on the claim that plaintiff wrongfully prevented Diamond East from completing the Boston Edison project.

The parties agreed to consolidate plaintiff's application for preliminary and permanent injunctive relief for trial before Judge Cedarbaum on the understanding that the plaintiff waived its right to a jury trial as to liability issues determined by the court but retained its right to a jury trial with respect to damages, which would take place if the plaintiff prevailed. After a trial in May 1986, Judge Cedarbaum on June 5, 1986, rendered her decision to the effect that Sagamore was entitled to a permanent injunction ordering Diamond West to transfer to Sagamore the 1,985,000 shares of Diamond East that had been issued to Diamond West and that the defendants' counterclaims should be dismissed.

After observing defendant Bovers' demeanor on the stand and listening to his testimony, Judge Cedarbaum found that he "was not a credible witness and I do not accept his version of the facts." She rejected the defendants' contention that the

EPA was extinguished under New York law upon the parties' formation of Diamond East as a corporation to carry out the project. She further found that Par. 5 of the EPA required Diamond West, and its officers, when they became unable to fulfill its obligation to obtain the $90 million long-term financing for Diamond East, to return the 1,985,000 shares issued to it, that there had been no waiver, modification, or other basis for excusing it from performance of that obligation, and that there was no adequate remedy other than specific performance. The court, however, denied the plaintiff's request for an order enjoining the defendants from disclosing to third parties alleged confidential data or information furnished by it to them in connection with the Project or from their engaging in similar activities since it was not shown that such confidential information or trade secret data had been turned over to them and a restriction on competition would be valid only for the duration of the joint venture, which was terminated. This appeal followed.

## DISCUSSION

Appellants contend that the district court erred (1) in its choice and interpretation of law governing the conditions under which a joint venture agreement (in this case the EPA) becomes unenforceable upon the parties' conduct of their business through a corporation, (2) in finding that there was no waiver or modification by the plaintiff of Diamond West's obligation under the EPA, and (3) in failing to excuse Diamond West's inability to obtain long-term financing within six months of the signing of the Boston Edison commitment. They argue that the formation of Diamond East rendered the EPA unenforceable as a matter of law, that the plaintiff waived enforcement of Par. 5 of the EPA (which required Diamond West to obtain the financing within the six-month period) and that Diamond West's obligation under Par. 5 to obtain the financing within the six-month period was excused as a matter of law by the impracticability of obtaining it during that period and

by the six-month time period not being of the essence.

■ With respect to the first contention, all parties agree that the law of Connecticut, as provided by Par. 12 of the EPA, governs. Although Connecticut enforces agreements between stockholders to the extent that they do not purport to manage or limit the management of a corporation's affairs, *see Weil v. Beresth,* 154 Conn. 12, 16, 220 A.2d 456, 459 (1966), its law is silent on the issue before us, which is whether a joint venture agreement is superseded and rendered unenforceable by the formation of a corporation to implement it. In this diversity suit in the Southern District of New York, where New York choice of law rules govern, we must therefore turn for guidance to the law of New York. *See Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 317 (2d Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984).

The principal New York decision relied upon by appellants for the proposition that the EPA ceased to be enforceable when Diamond East was formed to carry out the project is *Weisman v. Awnair Corp. of America,* 3 N.Y.2d 444, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957). In that case the plaintiffs (Weisman and Awnair Inc.) sued for an injunction and an accounting based on the defendants' breach of a joint venture agreement entered into by Weisman with the defendants for his distribution of their products through a corporation to be organized by him, of which 40% of the stock was to be issued to the defendants and 60% to plaintiff Weisman. After the corporation (Awnair Inc.) was formed by him and he expended large sums to market the defendants' products, they refused to permit the plaintiffs to continue distributing the defendants' products. The Court of Appeals noted that the alleged agreement between the parties was "vague, indefinite and conclusory," did not entitle "the corporate plaintiff ... to receive anything," and amounted to an agreement between three individuals "to conduct a business enterprise as joint venturers through the instru-

mentality of a corporation presenting itself to the world as the responsible entity." The court held that such "a joint venture may not be carried on by individuals *through* a corporate form" and that upon formation of the corporation and conduct of the business by it the individuals were shielded from personal liability and ceased to be partners. Using a broad generality, the court stated, "They cannot be partners *inter sese* and a corporation as to the rest of the world." 3 N.Y.2d at 449, 165 N.Y. S.2d at 750, 144 N.E.2d at 418 (quoting *Jackson v. Hooper*, 76 N.J.Eq. 592, 598–99, 75 A. 568, 571 (1909)).

The broad language of *Weisman* relied upon by defendant-appellants has been limited by subsequent New York decisions. Indeed, the ink was hardly dry on the opinion before the Court of Appeals began to restrict its scope. In *Macklem v. Marine Park Homes, Inc.*, 17 Misc.2d 439, 191 N.Y. S.2d 374 (Sup.Ct.1955), for instance, the trial court, before issuance of *Weisman* by the Court of Appeals, had enforced a joint venture agreement between individuals for the purchase and sale of realty despite the parties' formation of a corporation as a conduit to hold title to the realty and receive the proceeds from its sale. The plaintiff sued the other parties to the venture for his share of the proceeds, which had been distributed by the corporation to the defendants. Upon appeal the Appellate Division, Second Department, over the dissent of two justices based on the intervening *Weisman* decision, affirmed, 8 A.D.2d 824, 191 N.Y.S.2d 545 (1959), and the Court of Appeals, despite *Weisman,* dismissed the defendants' appeal, affirming the Appellate Division's decision. 7 N.Y.2d 887, 197 N.Y.S.2d 194, 165 N.E.2d 201, *aff'd mem.*, 8 N.Y.2d 1076, 207 N.Y.S.2d 451, 170 N.E.2d 455 (1960).

Our review of the decisions of New York courts since *Macklem* persuades us that what appeared to be a firm unconditional rule pronounced by *Weisman* has been since qualified to take into account factors which would make it unfair in some circumstances to deny enforcement of a joint venture agreement merely because a corpora-

tion has been formed pursuant to its terms. When the parties intend to merge their entire joint venture agreement, including their rights *inter sese* and the conduct of the business enterprise planned or conducted under the agreement, into the form of a corporation, they are bound by the result and are relegated to their rights as corporate stockholders. *See, e.g., Miglietta v. Kennecott Copper Corp.,* 25 A.D.2d 57, 266 N.Y.S.2d 936 (1966) (joint venture agreement provided that it was to be "merged into a corporation" and there was no reservation by plaintiffs of rights under the joint venture agreement); *Beck v. General Tire & Rubber Co.,* 98 A.D.2d 756, 469 N.Y.S.2d 785 (1983) (complete merger of parties' rights and business under agreement into corporation that operated business); *Judelson v. Weintraub,* 55 A.D.2d 906, 390 N.Y.S.2d 455 (2d Dept.1977) (merger of partnership business into corporation which conducted it; plaintiff's action for accounting dismissed on ground that his remedy was a suit to impress a trust on shares due him); *Farber v. Romano,* 232 N.Y.S.2d 285 (Sup.Ct.1962) (same).

On the other hand, when the parties to a joint venture agreement, in forming a corporation to carry out one or more of its objectives, intend to reserve certain rights *inter sese* under their agreement, which do not interfere with or restrict the management of the affairs of the corporation, its exercise of corporate powers, or the rights of third parties doing business with it, these rights being extrinsic to the corporate entity and its operations, such joint venture agreement may be enforced. *Arditi v. Dubitzky,* 354 F.2d 483 (2d Cir.1965) (formation pursuant to joint venture of a corporation to construct high-rise apartments did not bar party from seeking accounting based on fraud in inducing him to enter agreement); *Triggs v. Triggs,* 46 N.Y.2d 305, 413 N.Y.S.2d 325, 385 N.E.2d 1254 (1978) (stock purchase agreement between organizers of a corporation, which made "no intrusion on the unfettered management of corporate affairs," enforced); *Shapolsky v. Shapolsky,* 53

Misc.2d 830, 279 N.Y.S.2d 747 (Sup.Ct. 1966); aff'd, 28 A.D.2d 513, 282 N.Y.S.2d 163 (1967) (joint venture agreement, under which parties conduct real estate business by taking title to real estate in names of corporations formed by them, enforced on ground that it "is extrinsic to the corporate entities").

In short, New York courts have recognized that despite the all-inclusive, hard-and-fast pronouncement of *Weisman*, which was taken from the old case of *Jackson v. Hooper*, 76 N.J.Eq. 592, 75 A. 568 (1909), "[t]here is little logical reason why individuals cannot be 'partners *inter sese* and a corporation as to the rest of the world,' so long as the rights of third parties such as creditors are not involved." *Arditi v. Dubitzsky, supra,* 354 F.2d at 486. When third parties may be adversely affected by exercise of rights under the partnership agreement, however, those rights will not be enforced. *Fromkin v. Merrall Realty, Inc.,* 15 A.D.2d 919, 225 N.Y.S.2d 632 (1962). Thus a complete merger of a joint venture into corporate form, which legally supplants the venture, does not occur when the parties retain rights under the venture agreement that are not in conflict with the corporation's functioning, such as when the corporation is a mere "adjunct of a joint venture," *Fromkin v. Merrall Realty, Inc., supra,* 15 A.D.2d at 920, 225 N.Y.S.2d at 635, or the retained rights are "independent of and extrinsic to the corporate entity," *Shapolsky v. Shapolsky, supra,* 53 Misc.2d at 833–34, 279 N.Y.S.2d at 751. As was recognized even before *Weisman*, such an agreement "runs along side of the path of the corporation" without being merged into it. *Manacher v. Central Coal Co.,* 284 A.D. 380, 385, 131 N.Y.S.2d 671, 676 (1954), aff'd, 308 N.Y. 784, 125 N.E.2d 431 (1955).

■ Applying these principles to the present case, we have little difficulty concluding that the terms of the EPA invoked by Sagamore survived the formation of Diamond East and are enforceable. First, the parties clearly intended the EPA to survive formation of Diamond East. Second, the EPA does not in any way restrict the power of Diamond East's directors and officers to manage its projects; it merely authorized Sagamore (not Diamond East) to "act as manager of the Project [Boston Edison] until professional management is retained," which promptly occurred. Its pre-incorporation provisions enabling Diamond West to acquire an equity participation in Diamond East and requiring Diamond West to obtain a commitment to provide $90 million financing to Diamond East do not interfere with the functioning of the corporate vehicle and hence are clearly enforceable. Other provisions of the EPA relied on by Diamond West similarly do not impinge upon "the unfettered management of corporate affairs by the board of directors [of Diamond East]." *Triggs v. Triggs, supra,* 46 N.Y.2d at 307, 413 N.Y.S.2d at 326. Lastly, it is not argued that enforcement of the EPA adversely affected the rights of any third parties.

■ We need not linger long over Diamond West's contention that Sagamore orally waived or modified the unequivocal terms of the EPA, Par. 5(a)(ii) of which clearly obligated Diamond West, upon failing to obtain the $90 million long-term financing within six months after obtaining the Boston Edison commitment, to "retransfer and return" the 1,985,000 Diamond East shares issued to it. The EPA contemplated that shares might be issued to Diamond West before it obtained the financing, which is what occurred in May and June 1985, but that if Diamond West should thereafter fail to obtain the financing commitment the shares must be retransferred and returned. Since Diamond West completely failed to sustain its burden of proving an oral change of Par. 5(b)(ii) of the EPA, *Hess v. Dumouchel Paper Co.,* 154 Conn. 343, 349, 225 A.2d 797, 800 (1966), the district court's findings that there was no waiver or modification of Par. 5(b)(ii), far from being clearly erroneous, are clearly correct.

■ Nor do we find any merit in Diamond West's argument that the district court erred in failing to hold that it was excused from obtaining the $90 million long-term financing within six months on the ground that the "condition [was] not a material part of the agreed exchange and forfeiture would otherwise result." *Grenier v. Compratt Constr. Co.*, 189 Conn. 144, 148, 454 A.2d 1289, 1292 (1983) (quoting 2 Restatement (Second) of Contracts § 271). Contrary to appellants' contention, the record supports the district court's conclusion that obtaining the $90 million financing within six months was material and that it was not, because of the impossibility of obtaining permitting for the venture within that period, an impracticable condition amounting to an unlawful forfeiture. Schmitz testified that "[t]ime was of the essence" and the parties stipulated that completion of the proposed power plant within the time limit fixed by the Boston Edison contract (June 1, 1990) was "problematical". Although, as the district court found, a financial institution would not provide the financing (i.e., the funds, as distinguished from a commitment) until permitting was completed, Diamond West could have satisfied its obligation under Par. 5(b) of the EPA by obtaining a present commitment from a bank to provide the funds upon the completion of the permitting. As Sagamore persuasively notes, the record permits an inference that Diamond West's inability to obtain a financing agreement subject to issuance of permits was attributable to the failure of Diamond West to fulfill its obligation under the EPA to furnish the $1.5 million capital needed for the interim operation of Diamond East, with the result that Diamond East was forced to close down its office and terminate its employees. In short, the conditions specified by the EPA were not "impracticable" of accomplishment and did not work a "forfeiture".

The judgment granting a permanent injunction is affirmed. The mandate shall issue forthwith.