Ginger ROGERS, Plaintiff–Appellant,

v.

Alberto GRIMALDI, MGM/UA Entertainment Co., and PEA Produzioni Europee Associate, S.R.L., Defendants–Appellees.

Nos. 600, 601, Dockets 88–7826, 88–7828.

United States Court of Appeals,
Second Circuit.

Argued Dec. 22, 1988.

Decided May 5, 1989.

Barry G. Saretsky, New York City (Steven J. Ahmuty, Alan G. Katz, Debra J. Guzov, and Bower & Gardner, New York City, on the brief), for plaintiff-appellant.

Stephen F. Huff, New York City (Tom J. Ferber, Charles B. McKenna, and Pryor, Cashman, Sherman & Flynn, New York City, on the brief), for defendants-appellees.

Before NEWMAN and ALTIMARI, Circuit Judges, and GRIESA, District Judge.*

JON O. NEWMAN, Circuit Judge:

Appellant Ginger Rogers and the late Fred Astaire are among the most famous duos in show business history. Through their incomparable performances in Hollywood musicals, Ginger Rogers and Fred Astaire established themselves as paragons of style, elegance, and grace. A testament to their international recognition, and a key circumstance in this case, is the fact that Rogers and Astaire are among that small elite of the entertainment world whose identities are readily called to mind by just their first names, particularly the pairing "Ginger and Fred." This appeal presents a conflict between Rogers' right to protect her celebrated name and the right of others to express themselves freely in their own artistic work. Specifically, we must decide whether Rogers can prevent the use of the title "Ginger and Fred" for a fictional movie that only obliquely relates to Rogers and Astaire.

Rogers appeals from an order of the District Court for the Southern District of New York (Robert W. Sweet, Judge) dismissing on summary judgment her claims that defendants-appellees Alberto Grimaldi, MGM/UA Entertainment Co., and PEA Produzioni Europee Associate, S.R.L., producers and distributors of the motion picture "Ginger and Fred," violated the Lanham Act, 15 U.S.C. § 1125(a) (1982), and infringed her common law rights of publicity and privacy. *Rogers v. Grimaldi*, 695 F.Supp. 112 (S.D.N.Y.1988). Although we disagree with some of the reasoning of the District Court, we affirm.

## Background

Appellant Rogers has been an international celebrity for more than fifty years. In 1940, she won an Academy Award for her performance in the motion picture "Kitty Foyle." Her principal fame was established in a series of motion pictures in which she co-starred with Fred Astaire in the 1930s and 1940s, including "Top Hat" and "The Barkleys of Broadway."

There can be no dispute that Rogers' name has enormous drawing power in the entertainment world. Rogers has also used her name once for a commercial enterprise other than her show business career. In the mid–1970s, she licensed J.C. Penney, Inc. to produce a line of GINGER ROGERS lingerie. Rogers is also writing her autobiography, which she hopes to publish and possibly sell for adaptation as a movie.

In March 1986, appellees produced and distributed in the United States and Europe a film entitled "Ginger and Fred," [1] created and directed by famed Italian film-maker Federico Fellini. The film tells the story of two fictional Italian cabaret performers, Pippo and Amelia, who, in their heyday,

---

* The Honorable Thomas P. Griesa of the United States District Court for the Southern District of New York, sitting by designation.

1. Rogers contends that the title is "Ginger and Fred," while appellees contend that it is "Federico Fellini's 'Ginger and Fred.'" Without deciding the issue, we accept Rogers' contention for purposes of this appeal.

imitated Rogers and Astaire and became known in Italy as "Ginger and Fred." The film focuses on a televised reunion of Pippo and Amelia, many years after their retirement. Appellees describe the film as the bittersweet story of these two fictional dancers and as a satire of contemporary television variety shows.

The film received mixed reviews and played only briefly in its first run in the United States. Shortly after distribution of the film began, Rogers brought this suit, seeking permanent injunctive relief and money damages. Her complaint alleged that the defendants (1) violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), by creating the false impression that the film was about her or that she sponsored, endorsed, or was otherwise involved in the film, (2) violated her common law right of publicity, and (3) defamed her and violated her right to privacy by depicting her in a false light.

After two years of discovery, the defendants moved for summary judgment. In opposition to the motion, Rogers submitted a market research survey purporting to establish that the title "Ginger and Fred" misled potential movie viewers as to Rogers' connection with the film. Rogers also provided anecdotal evidence of confusion, including the fact that when MGM/UA publicists first heard the film's title (and before they saw the movie), they began gathering old photographs of Rogers and Astaire for possible use in an advertising campaign.

The District Court granted summary judgment to the defendants. Judge Sweet found that defendants' use of Rogers' first name in the title and screenplay of the film was an exercise of artistic expression rather than commercial speech. 695 F.Supp. at 120. He then held that "[b]ecause the speech at issue here is not primarily intended to serve a commercial purpose, the prohibitions of the Lanham Act do not apply, and the Film is entitled to the full scope of protection under the First Amendment." *Id.* at 120–21. The District Judge also held that First Amendment concerns barred Rogers' state law right of publicity claim.

*Id.* at 124. He also rejected Rogers' "false light" claim without elaboration.

### Discussion

#### I. Lanham Act

Section 43(a) of the Lanham Act creates civil liability for

Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false description or representation ... and shall cause such goods or services to enter into commerce....

15 U.S.C. § 1125(a) (1982).

The District Court ruled that because of First Amendment concerns, the Lanham Act cannot apply to the title of a motion picture where the title is "within the realm of artistic expression," 695 F.Supp. at 120, and is not "primarily intended to serve a commercial purpose," *id.* at 121. Use of the title "Ginger and Fred" did not violate the Act, the Court concluded, because of the undisputed artistic relevance of the title to the content of the film. *Id.* at 120. In effect, the District Court's ruling would create a nearly absolute privilege for movie titles, insulating them from Lanham Act claims as long as the film itself is an artistic work, and the title is relevant to the film's content. We think that approach unduly narrows the scope of the Act.

Movies, plays, books, and songs are all indisputably works of artistic expression and deserve protection. Nonetheless, they are also sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation. *See Central Hudson Gas & Electric v. Public Service Commission,* 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) ("The government may ban forms of communication more likely to deceive the public than inform it ..."); *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 276 n. 8 (2d Cir.1981). Poetic license is not without limits. The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the prod-

uct. Thus, it is well established that where the title of a movie or a book has acquired secondary meaning—that is, where the title is sufficiently well known that consumers associate it with a particular author's work —the holder of the rights to that title may prevent the use of the same or confusingly similar titles by other authors. *See, e.g., Warner Bros. Pictures, Inc. v. Majestic Pictures Corp.,* 70 F.2d 310 (2d Cir.1934); *Orion Pictures Co. v. Dell Publishing Co.,* 471 F.Supp. 392 (S.D.N.Y.1979); *Dawn Associates v. Links,* 4 Media L.Rep. (BNA) 1642, 1645–46 (N.D.Ill.1978). Indeed, it would be ironic if, in the name of the First Amendment, courts did not recognize the right of authors to protect titles of their creative work against infringement by other authors. *Cf. Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 556–60, 105 S.Ct. 2218, 2228–30, 85 L.Ed.2d 588 (1985) (noting that copyright law fosters free expression by protecting the right of authors to receive compensation for their work).

■ Though First Amendment concerns do not insulate titles of artistic works from all Lanham Act claims, such concerns must nonetheless inform our consideration of the scope of the Act as applied to claims involving such titles.[2] Titles, like the artistic works they identify, are of a hybrid nature, combining artistic expression and commercial promotion. The title of a movie may be both an integral element of the filmmaker's expression as well as a significant means of marketing the film to the public. The artistic and commercial elements of titles are inextricably intertwined. Filmmakers and authors frequently rely on word-play, ambiguity, irony, and allusion in titling their works. Furthermore, their interest in freedom of artistic expression is shared by their audience. The subtleties of a title can enrich a reader's or a viewer's understanding of a work. Consumers of artistic works thus have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression. For all these reasons, the expressive element of titles requires more protection than the labeling of ordinary commercial products.[3]

■ Because overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict. *See Silverman v. CBS,* 870 F.2d 40, 48 (2d Cir.1989); *Stop The Olympic Prison v. United States Olympic Committee,* 489 F.Supp. 1112 (S.D.N.Y. 1980); *cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Trades Council,* 485 U.S. 568, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("[T]he Court will construe [a] statute to avoid [serious constitutional problems] unless such construction is plainly contrary to the intent of Congress.").

Rogers contends that First Amendment concerns are implicated only where a title is so intimately related to the subject matter of a work that the author has no alternative means of expressing what the work is about. This "no alternative avenues of communication" standard derives from *Lloyd Corp. v. Tanner,* 407 U.S. 551, 566– 67, 92 S.Ct. 2219, 2227–28, 33 L.Ed.2d 131 (1972), and has been applied by several courts in the trademark context. *See, e.g., Mutual of Omaha Insurance Co. v. Novak,* 836 F.2d 397, 402 (8th Cir.1987), *cert.*

---

2. Several law review articles in recent years have explored the issue of First Amendment limits on trademark protection. *See* Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols,* 1982 Wis.L.Rev. 158 (1982); Dorsen, *Satiric Appropriation and the Law of Libel, Trademark, and Copyright: Remedies Without Wrongs,* 65 B.U.L.Rev. 923, 949–52 (1985); Note, *Trademark Parody: A Fair Use and First Amendment Analysis,* 72 Va.L.Rev. 1079 (1986); Kravitz, *Trademarks, Speech, and*

the Gay Olympics *Case,* 69 B.U.L.Rev. 131 (1989).

3. In other respects, trademark law has also accorded greater leeway for the use of titles than for names of ordinary commercial products, thus allowing breathing space for free expression. A confusingly similar title will not be deemed infringing unless the title alleged to be infringed, even if arbitrary or fanciful, has acquired secondary meaning. *See* 1 J. McCarthy, *Trademarks and Unfair Competition* § 10.2 (1984).

*denied,* —— U.S. ——, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988); *Reddy Communications, Inc. v. Environmental Action Foundation,* 199 U.S.P.Q. (BNA) 630, 634 (D.D.C.1977) ("[W]e do not see how defendant's First Amendment rights will be severely hampered if this one arrow is removed from its quiver.").

In the context of titles, this "no alternative" standard provides insufficient leeway for literary expression. In *Lloyd,* the issue was whether the First Amendment provided war protesters with the right to distribute leaflets on a shopping center owner's property. The Supreme Court held that it did not. But a restriction on the *location* of a speech is different from a restriction on the *words* the speaker may use. *See* Denicola, *supra,* at 197. As the Supreme Court has noted, albeit in a different context, "[W]e cannot indulge the facile assumption that one can forbid particular words without running a substantial risk of suppressing ideas in the process." *Cohen v. California,* 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).[4]

■ Thus, the "no alternative avenues" test does not sufficiently accommodate the public's interest in free expression, while the District Court's rule—that the Lanham Act is inapplicable to all titles that can be considered artistic expression—does not sufficiently protect the public against flagrant deception. We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work

whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.[5]

■ The reasons for striking the balance in this manner require some explanation. A misleading title with no artistic relevance cannot be sufficiently justified by a free expression interest. For example, if a filmmaker placed the title "Ginger and Fred" on a film to which it had no artistic relevance at all, the arguably misleading suggestions as to source or content implicitly conveyed by the title could be found to violate the Lanham Act as to such a film.

■ Even where a title surpassed the appropriately low threshold of minimal artistic relevance but was explicitly misleading as to source or content, a violation could be found. To illustrate, some titles— such as "Nimmer on Copyright" and "Jane Fonda's Workout Book"—explicitly state the author of the work or at least the name of the person the publisher is entitled to associate with the preparation of the work. Other titles contain words explicitly signifying endorsement, such as the phrase in a subtitle "an authorized biography." If such explicit references were used in a title and were false as applied to the underlying work, the consumer's interest in avoiding deception would warrant application of the Lanham Act, even if the title had some relevance to the work.

■ Many titles, however, include a well-known name without any overt indication of authorship or endorsement—for example, the hit song "Bette Davis Eyes," and the recent film "Come Back to the Five and Dime, Jimmy Dean, Jimmy Dean." To some people, these titles might implicitly suggest that the named celebrity had en-

---

**4.** This Circuit employed the "no alternative avenues of communication" standard in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979). As we stated in *Silverman,* however, that case involved a pornographic movie with blatantly false advertising. 870 F.2d at 48 n. 5. Advertisements for the movie were explicitly misleadingly, stating that the principal actress in the movie was a former Dallas Cowboys' cheerleader. We do not read *Dallas Cowboys Cheerleaders* as generally precluding all consideration of First

Amendment concerns whenever an allegedly infringing author has "alternative avenues of communication."

**5.** This limiting construction would not apply to misleading titles that are confusingly similar to other titles. The public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting authors to use such titles.

dorsed the work or had a role in producing it. Even if that suggestion is false, the title is artistically relevant to the work. In these circumstances, the slight risk that such use of a celebrity's name might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and the Lanham Act is not applicable. *Cf. Estate of Hemingway v. Random House, Inc.*, 23 N.Y.2d 341, 350, 296 N.Y.S.2d 771, 780, 244 N.E.2d 250, 260 (1968) (holding that estate of Ernest Hemingway had no cause of action for "palming off" or "unfair competition" against author of biographical memoir entitled "Papa Hemingway.").

Similarly, titles with at least minimal artistic relevance to the work may include explicit statements about the *content* of the work that are seriously misleading. For example, if the characters in the film in this case had published their memoirs under the title "The True Life Story of Ginger and Fred," and if the film-maker had then used that fictitious book title as the title of the film, the Lanham Act could be applicable to such an explicitly misleading description of content.[6] But many titles with a celebrity's name make no explicit statement that the work is about that person in any direct sense; the relevance of the title may be oblique and may become clear only after viewing or reading the work. As to such titles, the consumer interest in avoiding deception is too slight to warrant application of the Lanham Act. Though consumers frequently look to the title of a work to determine what it is about, they do not regard titles of artistic works in the same way as the names of ordinary commercial products. Since consumers expect an ordinary product to be what the name says it is, we apply the

Lanham Act with some rigor to prohibit names that misdescribe such goods. *See Johnson & Johnson v. GAC International, Inc.*, 862 F.2d 975 (2d Cir.1988). But most consumers are well aware that they cannot judge a book solely by its title any more than by its cover. We therefore need not interpret the Act to require that authors select titles that unambiguously describe what the work is about nor to preclude them from using titles that are only suggestive of some topics that the work is not about. Where a title with at least some artistic relevance to the work is not explicitly misleading as to the content of the work, it is not false advertising under the Lanham Act.

This construction of the Lanham Act accommodates consumer and artistic interests. It insulates from restriction titles with at least minimal artistic relevance that are ambiguous or only implicitly misleading but leaves vulnerable to claims of deception titles that are explicitly misleading as to source or content, or that have no artistic relevance at all.[7]

With this approach in mind, we now consider Rogers' Lanham Act claim to determine whether appellees are entitled to summary judgment. A federal court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The inquiry ... is ... whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

Rogers essentially claims that the title "Ginger and Fred" is false advertising.

---

**6.** In offering this hypothetical and others in this opinion, we intend only to indicate instances where Lanham Act coverage might be available; whether in such instances a violation is established would depend on the fact-finder's conclusions in light of all the relevant facts and circumstances.

**7.** We need not consider whether Congress could constitutionally bar the use of all literary titles

that are to any extent misleading. *Cf. San Francisco Arts & Athletics, Inc. v. United States Olympic Committee*, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (holding that the First Amendment does not bar a statute granting the United States Olympic Committee the right to enjoin even non-commercial uses of the word "Olympic").

Relying on her survey data, anecdotal evidence, and the title itself, she claims there is a likelihood of confusion that (1) Rogers produced, endorsed, sponsored, or approved the film, and/or (2) the film is about Rogers and Astaire, and that these contentions present triable issues of fact. In assessing the sufficiency of these claims, we accept Judge Sweet's conclusion, which is not subject to dispute, that the title "Ginger and Fred" surpasses the minimum threshold of artistic relevance to the film's content. The central characters in the film are nicknamed "Ginger" and "Fred," and these names are not arbitrarily chosen just to exploit the publicity value of their real life counterparts but instead have genuine relevance to the film's story. We consider separately the claims of confusion as to sponsorship and content.

The title "Ginger and Fred" contains no explicit indication that Rogers endorsed the film or had a role in producing it. The survey evidence, even if its validity is assumed,[8] indicates at most that some members of the public would draw the incorrect inference that Rogers had some involvement with the film. But that risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act. We therefore hold that the sponsorship and endorsement aspects of Rogers' Lanham Act claim raise no "genuine" issue that requires submission to a jury.

Rogers' claim that the title misleads consumers into thinking that the film is *about* her and Astaire also fails. Indeed, this case well illustrates the need for cau-

tion in applying the Lanham Act to titles alleged to mislead as to content. As both the survey and the evidence of the actual confusion among the movie's publicists show, there is no doubt a risk that some people looking at the title "Ginger and Fred" might think the film was about Rogers and Astaire in a direct, biographical sense. For those gaining that impression, the title is misleading. At the same time, the title is entirely truthful as to its content in referring to the film's fictional protagonists who are known to their Italian audience as "Ginger and Fred." Moreover, the title has an ironic meaning that is relevant to the film's content. As Fellini explains in an affidavit, Rogers and Astaire are to him "a glamorous and care-free symbol of what American cinema represented during the harsh times which Italy experienced in the 1930s and 1940s." In the film, he contrasts this elegance and class to the gaudiness and banality of contemporary television, which he satirizes. In this sense, the title is not misleading; on the contrary, it is an integral element of the film and the filmmaker's artistic expressions.[9]

This mixture of meanings, with the possibly misleading meaning not the result of explicit misstatement, precludes a Lanham Act claim for false description of content in this case. To the extent that there is a risk that the title will mislead some consumers as to what the work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression.

For these reasons, we hold that appellees are entitled to summary judgment on Rog-

---

**8.** The survey sampled 201 people who said they were likely to go to a movie in the next six months. Half of those surveyed were shown a card with the title "Ginger and Fred" on it; the other half were shown an actual advertisement for the movie. Of these 201, 38 percent responded "yes" to the question: "Do you think that the actress, Ginger Rogers, had anything to do with this film, or not?" Of these respondents, a third answered yes to the question: "Do you think Ginger Rogers was involved in any way with making this film or not?" In other words, about 14 percent of the total 201 surveyed found that the title suggested that Rogers was involved in making the film.

Appellees contend that the survey used "leading" questions, making the survey results invalid. Without resolving this issue, we will assume for the purposes of this appeal that the survey was valid.

**9.** Appellees also contend that advertisements for the film included a disclaimer that the film is fictional and does not depict any real person, living or dead. In light of our resolution of the case, we need not decide whether such a disclaimer would be sufficient to cure an otherwise deceptive title.

ers' claim that the title gives the false impression that the film is about Rogers and Astaire.

## II. State Law Claims

### A. *Right of Publicity*

Because the District Judge decided Rogers' state law claims on the ground of broad First Amendment protection, he did not decide which state's law applies to those claims. 695 F.Supp. at 121 n. 5. Although we reach the same result as the District Court, we think the correct approach is to decide the choice of law issue first and then to determine if Rogers has a triable claim under the applicable substantive law, before reaching constitutional issues.

A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Colgate Palmolive Co. v. S/S Dart Canada*, 724

F.2d 313, 316 (2d Cir.1983), *cert. denied*, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984). The New York Court of Appeals has clearly stated that "right of publicity" claims are governed by the substantive law of the plaintiff's domicile because rights of publicity constitute personalty. *Southeast Bank, N.A. v. Lawrence*, 66 N.Y.2d 910, 498 N.Y.S.2d 775, 489 N.E.2d 744 (1985). Rogers is an Oregon domiciliary, and thus Oregon law governs this claim.

Oregon courts, however, have not determined the scope of the common law right of publicity in that state. The Supreme Court of Oregon discussed the "right to publicity" in dictum in *Anderson v. Fisher Broadcasting Cos.*, 300 Or. 452, 712 P.2d 803, 812 (1986) (in banc), a case involving a right of privacy claim, but there are no reported decisions of any Oregon court on a right of publicity claim. We are therefore obliged to engage in the uncertain task of predicting what the New York courts would predict the Oregon courts would rule as to the contours of a right of publicity under Oregon law.[10]

---

**10.** This two-step process of divining the law of the foreign state to which the forum state's conflicts rules direct us appears to be a consequence both of *Klaxon* and of the fundamental tenet of diversity jurisdiction, equally applicable to the exercise of pendent jurisdiction over state law claims, that the federal court is "only another court of the State." *Guaranty Trust Co. v. York,* 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079 (1945); *see also Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 203, 76 S.Ct. 273, 276, 100 L.Ed. 199 (1956); *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886 (1967) (state law issue in federal question case). The two-step process was given its well-known formulation when Judge Friendly stated that our Court's task is "to determine what the New York courts would think the California courts would think on an issue about which neither had thought." *Nolan v. Transocean Air Lines,* 276 F.2d 280, 281 (2d Cir.1960), *remanded,* 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571 (1961), *adhered to,* 290 F.2d 904 (2d Cir.), *cert. denied,* 368 U.S. 901, 82 S.Ct. 177, 7 L.Ed.2d 96 (1961); *see also Allstate Insurance Co. v. Employers Liability Assurance Corp.,* 445 F.2d 1278, 1278 (5th Cir.1971).

On some occasions, however, we appear to have used a one-step process, making our own determination as to the content of the law of the foreign jurisdiction, without pausing to inquire what the forum state's courts would say the foreign state's courts would say. *See, e.g., Metz*

*v. United Technologies Corp.,* 754 F.2d 63, 66–67 (2d Cir.1985) (New York forum; Louisiana substantive law); *Entron, Inc. v. Affiliated FM Insurance Co.,* 749 F.2d 127, 131–32 (2d Cir.1984) (New York forum; New Jersey substantive law); *Perlman v. Feldmann,* 219 F.2d 173, 175–78 (2d Cir.) (Connecticut forum; Indiana substantive law), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955). The truncated approach also appears to have been used in *Factors Etc., Inc. v. Pro Arts, Inc.,* 652 F.2d 278 (2d Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct.1973, 72 L.Ed.2d 442 (1982), where we accepted the Sixth Circuit's view of Tennessee law, without inquiring whether New York, the forum state, would have given similar deference to the circuit in which the pertinent foreign state was located. *See also id.* at 284 (Mansfield, J., dissenting) (declining to defer to Sixth Circuit view of Tennessee law but also not inquiring what New York courts would do).

Perhaps the one-step cases reflect an implicit assumption that the forum state would consult the same materials surveyed by the federal court and make the same prediction as to the content of the foreign state's law, though, as we discuss below, that assumption is not always warranted, especially where New York is the forum state. *But see Essex Universal Corp. v. Yates,* 305 F.2d 572, 580 (2d Cir.1962) (Friendly, J., concurring) (citing *Perlman v. Feldmann, supra,* as an example of a federal court having the

At one time the New York courts, confronting an issue arising under the law of another state and having no clear indication of the foreign law, applied a presumption that "the common law of a sister state ... is the same as our own." *International Text–Book Co. v. Connelly*, 206 N.Y. 188, 200–01, 99 N.E. 722 (1912); *see also Zwirn v. Galento*, 288 N.Y. 428, 432, 43 N.E.2d 474 (1942). However, that presumption arose from a rule of evidence, the State's rule prohibiting a court from taking judicial notice of the law of another state. In 1943, New York by statute accorded its courts discretion to take judicial notice of foreign law, *see Pfleuger v. Pfleuger*, 304 N.Y. 148, 106 N.E.2d 495 (1952), and in 1963 required such judicial notice. N.Y. Civ.Prac.L. & R. 4511(a) (McKinney 1963). Though New York courts usually now recognize their obligation to take judicial notice of the law of another state, *see, e.g., Monko v. Cicoria*, 46 Misc.2d 565, 260 N.Y. S.2d 70 (Sup.Ct.1965), some New York courts still appear to be applying the pre-1963 law, even citing *International Text–Book* for the proposition that foreign law may or even must be presumed to be the same as New York's in the absence of proof to the contrary in the record. *See, e.g., Knieriemen v. Bache Halsey Stuart Shields Inc.*, 74 A.D.2d 290, 427 N.Y.S.2d 10, 15 (1st Dep't), *appeal dismissed*, 51 N.Y.2d 970, 435 N.Y.S.2d 720, 416 N.E.2d 1055 (1980); *Banco Do Brasil, S.A. v. Calhoon*, 50 Misc.2d 512, 270 N.Y.S.2d 691, 696 (Sup.Ct.1966).

There thus remains some ambiguity in the New York cases as to whether that State's courts, encountering an issue that turns on unsettled law of another state, will apply a presumption of similarity with New York law because of the remaining influence of the pre–1943 evidentiary cases that barred judicial notice of foreign law or will predict, as a matter of substantive interpretation, that the foreign state will adopt a rule similar to New York's. The distinction can have significance for a diversity court because it is not bound by a

state's judicial notice rules, *see Simmons v. Continental Casualty Co.*, 410 F.2d 881, 884 (8th Cir.1969); *Zell v. American Seating Co.*, 138 F.2d 641, 643 n. 6 (2d Cir. 1943), *rev'd on other grounds*, 322 U.S. 709, 64 S.Ct. 1053, 88 L.Ed. 1552 (1944); 1A Pt. 2 *Moore's Federal Practice* ¶ 0.316[4] (1987), but is obliged to apply whatever substantive standards the forum state uses in predicting the content of foreign law.

■ Indeed, our own cases have not taken a consistent approach to New York's presumption of similarity of foreign law in diversity cases in which New York is the forum state. On occasion, we have applied the presumption, apparently viewing it as a substantive rule of interpretation; in other cases, we have ignored it and made our own determination of what we think will emerge as the law of a foreign state. *Compare Sagamore Corp. v. Diamond West Energy Corp.*, 806 F.2d 373, 377 (2d Cir.1986), *and Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d at 317, *with Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987), *and Metz v. United Technologies Corp.*, 754 F.2d 63, 66 (2d Cir.1985). We believe that New York courts would, as a matter of substantive interpretation, presume that the unsettled common law of another state would resemble New York's but that they would examine the law of the other jurisdiction and that of other states, as well as their own, in making an ultimate determination as to the likely future content of the other jurisdiction's law. *See In re Estate of Havemeyer*, 17 N.Y.2d 216, 270 N.Y.S.2d 197, 217 N.E.2d 26 (1966); *Strain v. Seven Hills Associates*, 75 A.D.2d 360, 429 N.Y.S.2d 424, 430 (1st Dep't 1980). That is the task we now undertake.

■ The common law right of publicity, where it has been recognized, grants celebrities an exclusive right to control the commercial value of their names and to prevent

"freedom" to make its own determination of foreign (Indiana) law, a freedom used "to good

effect").

others from exploiting them without permission. *See Bi–Rite Enterprises v. Button Master,* 555 F.Supp. 1188, 1198–99 (S.D.N.Y.1983). Because the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement, it is potentially more expansive than the Lanham Act. *See* Denicola, *supra,* at 160–66. Perhaps for that reason, courts delineating the right of publicity, more frequently than in applying the Lanham Act, have recognized the need to limit the right to accommodate First Amendment concerns. *Id.* at 198 & n. 171 (citing cases).

In particular, three courts, citing their concern for free expression, have refused to extend the right of publicity to bar the use of a celebrity's name in the title and text of a fictional or semi-fictional book or movie. *See Hicks v. Casablanca Records,* 464 F.Supp. 426 (S.D.N.Y.1978); *Frosch v. Grosset & Dunlop, Inc.,* 75 A.D.2d 768, 427 N.Y.S.2d 828 (1st Dep't 1980); *Guglielmi v. Spelling–Goldberg Productions,* 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454, 455 (1979) (Bird, C.J., concurring).[11]

*Guglielmi* involved a suit by a nephew of the late film star Rudolph Valentino to bar a television broadcast entitled "Legend of Valentino: A Romantic Fiction" as a violation of Valentino's right of publicity. The Court dismissed the action for failure to state a claim. In a concurrence joined by three members of the Court, Chief Justice Bird stated: "[P]rominence invites creative comment. Surely, the range of free expression would be meaningfully reduced if prominent persons in the present and recent past were forbidden topics for the imaginations of authors of fiction." 160 Cal.Rptr. at 358, 603 P.2d at 460.[12]

Chief Justice Bird noted that a cause of action might have existed had the defendant, for example, published "Rudolph Valentino's Cookbook," and neither the reci-

pes nor the menus described were in any fashion related to Valentino. *Id.* at 355 n. 6, 603 P.2d at 457 n. 6. But she said that as long as the use of a celebrity's name was not "wholly unrelated" to the individual nor used to promote or endorse a collateral commercial product, the right of publicity did not apply. *Id.* Similarly, New York's Appellate Division said in *Frosch* that the right of publicity did not bar the use of a celebrity's name in a title so long as the item was a literary work and not "simply a disguised commercial advertisement for the sale of goods or services." 427 N.Y.S.2d at 829.

We think New York would recognize similar limits in Oregon law on the right of publicity. We note, for example, that the Oregon Supreme Court has on occasion interpreted the free speech clause of the Oregon Constitution as providing broader protection for free expression than that mandated by the federal Constitution. *Compare Wheeler v. Green,* 286 Or. 99, 593 P.2d 777, 788–89 (1979) (holding that Article I, § 8 of the Oregon Constitution prohibits punitive damages in defamation cases), *with Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (holding that states may impose punitive damages for defamation where the plaintiff proves knowing falsity or reckless disregard for the truth). In light of the Oregon Court's concern for the protection of free expression, New York would not expect Oregon to permit the right of publicity to bar the use of a celebrity's name in a movie title unless the title was "wholly unrelated" to the movie or was "simply a disguised commercial advertisement for the sale of goods or services."

Here, as explained above, the title "Ginger and Fred" is clearly related to the content of the movie and is not a disguised advertisement for the sale of goods or ser-

---

**11.** Commentators have also advocated limits on the right of publicity to accommodate First Amendment concerns. *See, e.g.,* Treece, *Commercial Exploitation of Names, Likenesses, and Personal Histories,* 51 Tex.L.Rev. 637 (1973).

**12.** The majority of the in banc court did not discuss the First Amendment issues, rejecting the claim instead on the ground that the right of publicity expires on the death of the person protected. 160 Cal.Rptr. at 353, 603 P.2d at 455.

vices or a collateral commercial product. We therefore hold that under Oregon law the right of publicity does not provide relief for Rogers' claim.[13]

### B. False–Light Defamation

█ Rogers claims that the film portrays her in a false light by depicting the dance pair in the film in a tawdry and "seedy" manner. Complaint, ¶ 18. We need not dwell long on this claim, nor need we decide which state's law governs it. The film is manifestly not about Rogers. It is about a pair of fictional characters who are like Rogers and Astaire only in their imagination and in the sentimental eyes of their fictional audience. We know of no state law that provides relief for false-light defamation against a work that clearly does not portray the plaintiff at all.

### Conclusion

In sum, we hold that section 43(a) of the Lanham Act does not bar a minimally relevant use of a celebrity's name in the title of an artistic work where the title does not explicitly denote authorship, sponsorship, or endorsement by the celebrity or explicitly mislead as to content. Similarly, we conclude that Oregon law on the right of publicity, as interpreted by New York, would not bar the use of a celebrity's name in a movie title unless the title was "wholly unrelated" to the movie or was "simply a disguised commercial advertisement for the sale of goods or services." Under these standards, summary judgment was properly entered on the undisputed facts of this case, rejecting the Lanham Act and right of publicity claims, as well as the claim for false-light defamation.

We therefore affirm the judgment of the District Court.

GRIESA, District Judge, concurring in the result:

I concur with the result reached in the majority opinion, but have substantial disagreement with the opinion otherwise.

At the outset, a brief word about the development of the issues is in order.

The original claim of Rogers, as stated in the complaint, did not have any separate allegation about the title of the film as such. The complaint was directed against "the Film." The first cause of action, claiming violation of Rogers' right of publicity, was directed against the production and distribution of the Film. The second alleged that the Film depicted Rogers in a false light. The third cause of action, under the Lanham Act, was directed against the Film and its advertising. In her submissions on the summary judgment motion, Rogers focused mainly on the alleged wrongdoing of defendants in entitling the Film and in promoting and advertising the Film.

Judge Sweet's opinion treated the issue as relating to "the Film's title and screenplay." He discussed promotion and advertising, but not as a significant separate claim. His holding was that the Film (including the title and the screenplay) is entitled to First Amendment protection and does not violate the Lanham Act or state law rules.

On appeal, the only issues raised by Rogers relate to the title and to the advertising and promotion. No claim is made regarding the screenplay. The only issue dealt with in the majority opinion is that relating to the title. I have no objection to this feature of the majority opinion. My objection is to how the issue is handled.

### Lanham Act

According to the majority, Judge Sweet's Lanham Act ruling creates a broad immuni-

---

**13.** As in our ruling on the Lanham Act claim, we need not, and do not, reach the issue of whether the First Amendment would preclude a state from giving broader application to the right of publicity. The Supreme Court explored the First Amendment limits on the right of publicity in *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), holding that the First Amendment does not preclude an award of damages to a performer for violation of the right of publicity where a television news program broadcasts a performer's entire act. But the Court explicitly recognized each state's authority to define the right more narrowly. *Id.* at 578–79, 97 S.Ct. at 2859.

ty which would prevent a remedy in instances of "flagrant deception." To deal with this problem, the majority attempts to set out more precise standards by which lawful titles are to be differentiated from unlawful ones. It is said that the Lanham Act

... should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.

To implement this vague and fluid test, the majority goes on to articulate two specific rules. *First*, titles which are artistically relevant to an underlying work but are "explicitly misleading" violate the Lanham Act. *Second*, titles which are artistically relevant but "ambiguous or only implicitly misleading" do not violate the Lanham Act.

I do not believe that anything in Judge Sweet's opinion, sensibly read, would interfere with the protection of the public against "flagrant deception." But whatever may be the problem with Judge Sweet's opinion, the cure offered by the majority is far worse than the ailment.

Judge Sweet's reasoning can be briefly summarized as follows. Since the two main characters of the Film, Pippo and Amelia, are depicted as having made their living by imitating Ginger Rogers and Fred Astaire, there is, in a unique but entirely lawful manner, a reference to Ginger Rogers in the Film. The name "Ginger" is relevant to both the Film's screenplay and its title. The screenplay and title are within the realm of artistic expression, and are thus entitled to an appropriately broad measure of protection under the First Amendment, a level of protection greater than would be accorded if this were commercial speech. The possibility that alternate avenues of expression might have been used does not create a valid Lanham Act claim. The judge noted that there is nothing in the record to suggest an intention to use Ginger Rogers' name to deceive the public into coming to the movie under the mistaken belief that it was about the true Rogers and Astaire. 695 F.Supp. 113, 120–21.

The essential points of Judge Sweet's rationale are echoed in the majority opinion, which states that the title "is an integral element of the film and the film-maker's artistic expression," and that "the expressive element of titles requires more protection than the labeling of ordinary commercial products." However, the majority opinion expresses the concern that the district court's ruling would create "a nearly absolute privilege for movie titles," because of what are thought to be broad statements about the First Amendment protection accorded to artistic speech as distinct from commercial speech.

In my view, this concern is unfounded. Judge Sweet's discussion of First Amendment protection for artistic expression was his basis for deciding *this case*. He did not purport to write a treatise or attempt to say how various other cases with different facts should be treated. This is not to say that the ruling would not, justifiably, have some general precedential effect. It is undoubtedly true that most titles which are artistically relevant to the underlying work would be protected under the First Amendment from Lanham Act claims. However, Judge Sweet did not purport to write the law covering all possible situations.

The problem of an overly expansive ruling really lies with the majority opinion and its unfortunate attempt to establish a rule based on the asserted difference between explicitly misleading titles and those which are ambiguous or only implicitly misleading.

All the judges involved here agree that the title "Ginger and Fred" does not violate the Lanham Act. Although the title may mean different things to different people, the artistic relationship between the title and the Film protects both from the strictures of the statute.

However, this unique case would seem to be an inappropriate vehicle for fashioning a general rule of the kind announced by the majority. The unusual circumstances here do not provide a valid illustration of the general proposition (which I regard as dubious indeed) that there is a legal boundary between implicitly misleading titles and ex-

plicitly misleading ones. The majority opinion does not use the facts of this case to define the asserted distinction, but seeks to give substance to the announced rule through the use of certain hypothetical examples.

The majority attempts to give illustrations of titles which would be artistically relevant but explicitly misleading. It is said that if the titles "Nimmer on Copyright" and "Jane Fonda's Workout Book" were used in a manner which was "false as applied to the underlying work" there would be liability under the Lanham Act. But these examples really go nowhere. It is not specified what the underlying works would be where such titles would be false but "artistically relevant." The simple fact is that if either of these titles was used in connection with some bogus work, it would be a simple case of the copying of a legally protected title. *See Warner Bros. Pictures, Inc. v. Majestic Pictures Corp.*, 70 F.2d 310 (2d Cir.1934); *Orion Pictures Co. v. Dell Publishing Co.*, 471 F.Supp. 392 (S.D.N.Y.1979). Thus the illustrations have nothing whatever to do with the kind of problem under discussion here.

The majority opinion states that, in the present case, the title would have been explicitly misleading if it had been "The True Life Story of Ginger and Fred." Of course, this awkward assemblage could hardly be expected to come under the consideration of a director such as Fellini. If, by some strange circumstance, it had been used, and if the majority opinion's legal doctrine were applied to it, lawyers might debate extensively about whether it was indeed misleading, and if so, whether it fell into the explicit or the implicit category. But the fact is that the example does not pose a realistic legal problem.

Coming to the other branch of the rule created by the majority, the opinion attempts to give illustrations of titles which would be artistically relevant and implicitly misleading—*i.e.*, which "impliedly suggest that the named celebrity had endorsed the work or had a role in producing it." The examples given are the song "Bette Davis Eyes" and the film "Come Back to the Five and Dime, Jimmy Dean, Jimmy Dean." But these examples in no way illustrate the majority's proposition. No one can seriously think that these titles imply or suggest that Bette Davis or James Dean endorsed or had a role in producing the song or the film.

In my view, the rule of the majority opinion, involving the two purported categories, is not well founded. It should be left to future courts, dealing with real cases, to determine if there are to be exceptions to the First Amendment protection which would seem to be generally afforded to artistically relevant titles. To say the least, the hypotheticals in the majority opinion are a poor basis for arriving at serious legal propositions. When and if an actual case arises, it may not fit within either of the categories posited by the majority. Also, it is most likely that the distinction between explicitly and implicitly misleading titles will prove to be unsound and unworkable.

State Law Claims

A respectable common sense approach to choice of law problems is simply to avoid them when it is clear that the law of the various jurisdictions under consideration is the same. There is a sufficient discussion of the law dealing with the right to publicity in *Anderson v. Fisher Broadcasting*, 300 Or. 452, 712 P.2d 803, 812 (1986), to indicate that the law of Oregon on this subject is basically no different from that expressed in the New York, California and federal decisions relied on by Judge Sweet and in the majority opinion. Judge Sweet sensibly avoided a lengthy excursion into the subject of choice of law.