**PAM MEDIA, INC. and EFM Media Management, Inc., Plaintiffs,**

v.

**AMERICAN RESEARCH CORPORATION, a/k/a USA Talk Network Inc., a/k/a After The Rush, Ltd., and Aaron Harber, Defendants.**

Civ. A. No. 94–M–1942.

United States District Court, D. Colorado.

June 6, 1995.

Carole Jeffery, Davis, Graham & Stubbs, Denver, CO and Karen S. Frieman, Cowan, Gold, DeBaets, Abrahams & Sheppard, New York City, for plaintiffs.

Edward T. Ramey, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, Chief Judge.

The plaintiffs, PAM Media, Inc. ("PAM") and EFM Media Management, Inc. ("EFM") are, respectively, the producer and syndicator of "The Rush Limbaugh Show," a commercially successful radio talk show. Rush Limbaugh is the host and principal commentator on that program which has been on the air since 1988. It is broadcast daily on over 600 radio stations to a national audience estimated at 20 million listeners. Rush Limbaugh is a highly publicized political and social commentator with a well known ideology.

Defendant American Research Corporation ("ARC"), a Colorado corporation with its principal place of business in Boulder, Colorado, through a division called USA Talk Network ("USA–TN"), develops syndicated radio programming. Aaron Harber ("Harber"), an individual resident of Boulder, is an officer and a principal in ARC.

The defendants began to market a radio talk program entitled "After The Rush" in 1994. Aaron Harber is the host and commentator of that program. The objective of "After The Rush" is the presentation of views from a perspective ideologically opposite to that of Rush Limbaugh.

USA–TN circulated a press release, promotional brochure, initial contact letter and demo tape to owners and general managers of radio stations in the top fifty markets and to others in the broadcast business to solicit stations to broadcast "After The Rush."

The press release (Exhibit 1) included the following paragraph:

Tyson explained, "We will focus on controversial subjects as well as provide comedic entertainment without being offensive." By airing the show live, immediately following "The Rush Limbaugh Show" at 3:00 P.M. Eastern Standard Time, "After The Rush" can continue the discussion begun each day by the conservative talk shows. "By coming on immediately after Limbaugh and so many of the Baby Rushes, we can capture the interest of a wide range of listeners," Tyson asserted. "They want more."

In their promotional brochure (Exhibit 2), the defendants informed that their program is designed for the following groups:

Listeners who want to continue the discussion of the issues raised by Rush and "Baby Rushes" on a day-by-day basis but can't get through jammed telephone lines or simply just can't get enough of Rush.

Non-listeners who would listen to a more balanced, less strident program.

Radio stations who carry Rush today and want to extend the success of the Rush phenomenon beyond the three hours which Rush graces their stations each weekday.

Radio stations who carry Rush but are seeking balance to their programming.

Radio stations who do not have Rush but who want to capture some of the benefits of the Rush phenomenon.

Advertisers who understand that people listening to Talk Radio are more likely to listen to their ads. This is because "Talk Radio" listeners use the radio in a different way than "music" listeners, who use radio as background. If they're listening to your talk programming, they're hearing your ads.

Advertisers who want more balanced demographics, especially in regard to women listeners (age 30 to 45).

Advertisers who are reluctant to buy Rush or "Baby Rushes" today because of their fear of being associated with programming perceived by their customers or prospects as offensive.

PAM, EFM and Rush Limbaugh have no affiliation or association with the defendants and have neither sponsored nor approved the defendants' program or use of the title "After The Rush." After demanding that the defendants cease and desist use of that name, the

plaintiffs filed this lawsuit on August 19, 1994. A motion for a preliminary injunction was withdrawn in October, 1994, when the defendants agreed to use the alternative titles "The Show With No Name" and "The Aaron Harber Show" while this case was pending.

The plaintiffs have asserted four claims for relief. The first claim alleges a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) by false designation and false description. The second claim, also under § 1125(a), is for false advertising. The third claim asserts unfair competition by the use of a confusingly and deceptively similar title and the fourth claim is based on an alleged violation of Rush Limbaugh's common law right of publicity, which he assigned to the plaintiffs.

The plaintiffs moved for a partial summary judgment, seeking a permanent injunction prohibiting the defendants' use of "After The Rush" as confusingly similar to "The Rush Limbaugh Show." The plaintiffs contend that the defendants' title creates the false impression that the two shows are somehow associated or that the plaintiffs have approved of or sponsor the defendants' program. The defendants moved for summary judgment of dismissal of all of the plaintiffs' claims, contending that there is no likelihood of confusion because of the polarity of the political and social views of Rush Limbaugh and Aaron Harber; that the title "After The Rush" is a parody of the plaintiffs' show and that this title is an integral part of the defendants' message.

The defendants also seek summary judgment on their counterclaims for a judgment declaring that their use of "After The Rush" does not violate or infringe upon the plaintiffs' rights and that granting any of the plaintiffs' claims for relief would violate the defendants' freedom of expression protected by the First Amendment to the United States Constitution.

■ Because it would be dispositive of this litigation, the defendants' claim of First Amendment protection is of primary importance. The question arises in a novel context: there is no legal precedent involving talk show radio. At oral argument on these motions, there was agreement that the primary purpose of such programs is the entertainment of the listening audience and that to be successful commercially talk show hosts must engage in lively and provocative dialogue with the persons who call in their comments. The programs are live broadcasts with the tenor and context of the discussion largely managed and controlled by the host.

The defendants cite *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir.1989) in support of their argument that the Lanham Act may be trumped by their freedom of artistic expression. There, the appellate court affirmed a summary judgment dismissing the claim of Ginger Rogers that the defendant created a false impression of her involvement with his movie entitled "Ginger and Fred." The district court found that the use of plaintiff's first name in the film's title was a protected artistic expression and not commercial exploitation because it was directly relevant to the story line about two performers who made a career imitating Ginger Rogers and Fred Astaire.

In weighing the competing public interests in avoiding consumer confusion and providing free artistic expression, the court of appeals suggested that:

"In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.* at 999.

The First Amendment was a part of the rationale in *Yankee Publishing, Inc. v. News America Publishing, Inc.*, 809 F.Supp. 267 (S.D.N.Y.1992) protecting the unauthorized use of the *Old Farmers Almanac* trade dress in a comic communication.

There is no doubt that there are strong First Amendment values involved in this dispute. Rush Limbaugh has personified an identifiable political and social perspective on a wide range of public issues. Persons participating in and listening to his radio program may reasonably anticipate that the dis-

cussion will follow a somewhat predictable pattern. Aaron Harber has a political and social perspective in direct conflict with that of Rush Limbaugh on the same public issues. A primary purpose of "After The Rush" is to provide a counterbalance to "The Rush Limbaugh Show." The defendants say that the use of the word "Rush" in their challenged title is to identify Rush Limbaugh and other talk show hosts expressing viewpoints similar to his as the targets of the contrasting opinions expected to be heard on the "After The Rush" program. Accordingly, it is argued that this title is necessary to identify the content of the defendants' program.

The difficulty with the defendants' position is the ambiguity of the title they selected. "After The Rush" is not the same as saying "Aaron Harber disagrees with Rush Limbaugh and wants to talk about it." That statement as a title would be a protected communication. "After The Rush" may be perceived to have multiple meanings. In the context of the promotional material, it describes the suggested timing for the program—the show immediately following "The Rush Limbaugh Show." It also suggests that listeners may expect more of the same type of discussion as that heard in dialogue with Rush Limbaugh. It may refer to an alternative voice, as defendants claim.

The *Rogers* case is not persuasive precedent because a radio talk show is fundamentally different from those forms of expression generally characterized as artistic works. Books, plays, movies and most television programs have established form and content. Story lines, pictorial images and articulated ideas give meaning to their titles. Any given title may be considered in the context of the work taken as a whole.

That may not be said of a talk radio show. Within their general design these programs feature spontaneity and free flow of colloquy. Their content depends on who calls in, what they say, and how they say it. Interaction with the show host may go off in unplanned and unforeseen directions. Presumably, these free form aspects of such shows are a part of the entertainment appeal to the listening audience which will include those who may agree and those who may disagree with the predominant tone of the program established in the host's commentary.

The defendants' demo tape illustrates these features.

That program begins with identifying Aaron Harber as "America's Number One Liberal." After some commentary by the host, including a statement about abortion, the first two callers challenged his point of view. The health care system is the subject of disagreement with another caller. Mr. Harber's tone with the callers is caustic and confrontational.

The defendants contend that after a few moments listening no one would confuse Aaron Harber with Rush Limbaugh or believe that Mr. Harber was tagging along behind Mr. Limbaugh. While the contrasting viewpoints of these two hosts may be readily apparent, the question is whether there may be confusion about the source and sponsorship of the two programs. The issue here is not whether these two men should freely engage in the equivalent of a radio debate. It is whether the defendants' promotional scheme violates principles of fair marketing.

Section 43(a) of the Lanham Act prohibits a person from using a word, term, name or any false designation of origin which is likely to cause confusion or mistake about the affiliation, connection or association of such person with another person, or confusion as to the origin, sponsorship or approval of his or her goods or services by another person. 15 U.S.C. § 1125(a). To prevail on the Lanham Act claims, the plaintiffs must prove that use of the name "After The Rush" creates a likelihood of such confusion. *White v. Samsung Elec. America, Inc.*, 971 F.2d 1395, 1399 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993).

█ "The Rush Limbaugh Show" is, on its face, a descriptive trade name. It is not disputed that it has acquired a secondary meaning and is therefore entitled to protection from a likelihood of confusion. The Tenth Circuit Court of Appeals articulated the factors to be considered in determining that question in *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920 (10th Cir.1986). They include: (1) the degree of similarity

between the designation and the trademark or trade name; (2) the intent of the actor in adopting the designation; (3) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other; and (4) the degree of care likely to be exerted by purchasers. These factors are interrelated. No one factor is determinative. *Beer Nuts,* 805 F.2d at 925.

### a. The degree of similarity

■ Marks may be deemed confusingly similar if they look or sound similar, or convey the same idea or meaning. *Jordache Enters., Inc. v. Hogg Wyld, Ltd.,* 828 F.2d 1482, 1485 (10th Cir.1987). "[A] court must determine, in light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'" *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1109 (6th Cir.1991) (quoting *Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1187 (6th Cir.1988)); *Beer Nuts,* 805 F.2d at 925. *See also, International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1088 (7th Cir.1988) (the marks must be compared in light of what occurs in the marketplace, not in the courtroom). Thus, it is the overall impression of the mark that counts, not any individual feature. *Homeowners Group,* 931 F.2d at 1109. Similarities are to be weighed more heavily than differences. *Beer Nuts,* 805 F.2d at 925.

The defendants rely on *Jordache* to support their argument that "After The Rush" is not confusingly similar to "The Rush Limbaugh Show." In that case, the Court of Appeals upheld the district court's determination that the dissimilarities between the defendant's mark (a brightly colored pig) and the plaintiff's (a more subtle horse design), greatly outweighed any similarities, even though the names, "Jordache" and "Lardashe" had similar sounds. Defendants claim that both the appearance and the meaning of the term "After The Rush" distinguishes it from that which it succeeds and to which it is intended to respond.

Plaintiffs focus on the fact that the key word in "After The Rush" is an identifying word in plaintiffs' trade name and argue that this case differs from *Jordache* because there are no visual clues available to radio listeners to help distinguish the programs as the Lardashe pig contrasted with the Jordache horse. Plaintiffs challenge the defendants' contention that the contrasting philosophies differentiate these programs by observing that sponsors of other commentary programs have used counterpoints in their presentations. Additionally, there is established law that similarity is to be determined at the time of initial encounter. Thus, in *Lindy Pen Co., Inc. v. Bic Pen Corp.,* 796 F.2d 254 (9th Cir.1986), the Ninth Circuit Court of Appeals held that post-sale inspections cannot negate or cure initial similarity. *Lindy Pen Co.,* 796 F.2d at 254–56. *See also, Dreyfus Fund, Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1122 (S.D.N.Y.1981) (customer confusion does not need to persist and to cause lost sales to violate the Lanham Act).

This is a "promotional goods" case. The question of confusion is not resolved by contrasting Aaron Harber with Rush Limbaugh. The inquiry is whether station managers or listeners are likely to be confused about production, licensing and sponsorship of these two shows. *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 32 (1st Cir.1989); *Amoco Oil Co. v. Rainbow Snow,* 748 F.2d 556 (10th Cir.1984).

### b. The intent of the actor in adopting the designation

The deliberate adoption of a similar mark with an intent to deceive can be the controlling factor in determining likelihood of confusion. "The proper focus is whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *Jordache,* 828 F.2d at 1485 (quoting *Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 431 (5th Cir.1984)). Thus:

[w]hen a manufacturer intentionally uses another's mark as a means of establishing a link in consumers' minds with the other's enterprise, and directly profits from that link, there is an unmistakable aura of deception. Such a use is, by its very nature "likely to cause confusion, or cause mistake, or to deceive."

*Boston Athletic Ass'n,* 867 F.2d at 35 (finding no genuine issue of fact that the purchasing public will believe that the sponsor of the Boston Marathon produces, licenses, or otherwise endorses Defendants' goods with the Boston Marathon logo).

Plaintiffs argue that the intent of the defendants to create confusion is clear. While defendants deny that motive, their promotional materials quoted above suggest a purpose to retain a part of the audience hearing "The Rush Limbaugh Show" and to trade on its success.

The defendants say that they intend to amuse, not confuse. They claim that "After The Rush" identifies their target and objective. Referring to Rush Limbaugh and his "Rushisms" is said to be necessary to ridicule him, parody his format, and provide an effective response to his views. Thus, confusing these two programs would be fatal to chances for success of "After The Rush" because the show's credibility would be injured if the public believed the show was sponsored by the very person it was attacking. The argument does not meet the contention that there may be confusion as to the producers and syndicators.

Whether the defendants' promotional efforts are for the purpose of exploitation or exposition must be determined through the trial process.

### c. *The relation in use and manner of marketing the goods or services*

Similarity of customers and marketing methods increase the likelihood of confusion. The parties have presented conflicting contentions about the selectivity of the audience for talk show radio programming.

### d. *The degree of care likely to be exerted by purchasers*

Goods or services that are inexpensive and purchased with little care are more likely to be confused than expensive items which are purchased with care. *Beer Nuts,* 805 F.2d at 926. When the buyer is a professional or expert in the field, there is less likely to be confusion than in the case of ordinary consumers. *Homeowners Group,* 931 F.2d at 1111.

Plaintiffs assert that radio listeners do not have the sophistication to distinguish sponsorship of different shows. Edward McLaughlin, chairman of PAM and EFM, states in his affidavit that the listening public will not use a high degree of care in distinguishing the sponsorship of the two shows because many listen to the show in their cars, a "less than optimal listening environment."

Defendants argue that the degree of care taken by listeners and radio station managers in choosing a talk radio show is at least as high as consumers buying blue jeans (as in *Jordache* ). In support, they offer the affidavit of Edward Brannigan, the operations manager of a radio station in Biddeford, Maine, who opined that talk programming demands listener attention and engages the listener. That contrasts with music which may be background radio. Further, he believes that the audience for "The Rush Limbaugh Show" and "After The Rush" are knowledgeable about social and political issues and pay careful attention to the content of the shows they choose to hear.

Thus, the parties have presented conflicting evidence as to the fourth factor.

Evidence of *actual* confusion is relevant in determining likelihood of confusion, although the absence of such evidence is not controlling. *Beer Nuts,* 805 F.2d at 928. "[W]hile very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof." *International Kennel Club,* 846 F.2d at 1089 (affirming preliminary injunction against defendant for its use of the word "International Kennel Club" on a line of stuffed toys).

Plaintiffs offer evidence of actual confusion in an affidavit from James Michael Shields, the general manager of the Tucson affiliate station for the Rush Limbaugh Show. Mr. Shields said that when he received the defendants' promotional materials, he contacted EFM to see if they were aware of or somehow involved in "After The Rush."

In response to Mr. Shields, the defendants offer Edward Brannigan's affidavit, saying that, as a station manager, he would never believe that the plaintiffs would sponsor a political attack on themselves. He acquired "After The Rush" to balance the political debate and believes there is no risk of confusion. Since the show has never aired as "After The Rush," neither party has provided evidence of actual confusion among listeners.

Because there are disputes about the factors determining likelihood of confusion, the issue cannot be determined on these motions for summary judgment.

These disputed fact questions will require a trial to determine both liability and remedy on the plaintiffs' first two claims for relief. The third claim for relief under the Colorado Consumer Protection Act involves the same fact questions. Because the plaintiffs seek damages in addition to an injunction, the factual issues will be decided by a jury.

The fourth claim seeks relief based on Rush Limbaugh's "right of publicity." The plaintiffs are assignees of that right. As articulated in the Restatement (Third) of Unfair Competition (1995), the claim is that a well known person should have control over the commercial value of his identity and may obtain redress for injury to both his commercial and personal interests caused by an unauthorized commercial use of that public identity. A clear example appears in *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831 (6th Cir.1983) (finding that Johnny Carson's right of publicity was invaded when the defendants marketed a brand of toilets called "Here's Johnny").

There is no Colorado case adopting this principle. Assuming that the Colorado courts would follow the Restatement, the defendants' motion for summary judgment will be granted on this claim because the plaintiffs have not made a sufficient showing that the defendants have attempted to exploit the persona of Rush Limbaugh for their commercial benefit. None of the defendants' promotional material suggests that Rush Limbaugh, himself, is involved with "After The Rush." His name is used because it symbolizes a particular perspective on the public

issues which are the grist for the mills of both programs. The ideology of Rush Limbaugh is not protectable by a right of publicity. The publication of a celebrity's opinions and commentaries invites the use of his name by other commentators expressing their contrasting opinions.

Public disagreement with Rush Limbaugh on a competing radio talk show is not the exploitation of his identity. Likelihood of confusion about production and syndication of the two programs because of their titles is different from suggesting personal endorsement or sponsorship by the person whose name is well known. The rationale for a right of publicity is distinct from that supporting the law of unfair competition. The latter is based on the need for protecting the integrity of the process by which goods and services are marketed. The former is for protection of a person. The right of publicity is not involved here.

Upon the foregoing, it is

ORDERED that the plaintiffs' motion for partial summary judgment is denied and the defendants' motion for summary judgment is also denied in all respects except for dismissal of the plaintiffs' fourth claim for relief as to which it is granted.